[Crim. No. 14083. Fourth Dist., Div. Two. Dec. 22, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
DeWAYNE FEDERICO, Defendant and Appellant.

COUNSEL

Jim Thomson, under appointment by the Court of Appeal, for Defendant and Appellant.

Joseph Peter Myers as Amicus Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Michael D. Wellington and Thomas F. McArdle, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUFMAN, J.—DeWayne Federico (defendant) appeals from a judgment of conviction of first degree murder and robbery and an order denying his motion for new trial.[1]

Defendant and Richard Joseph Ybarra[2] were charged in a two-count information with robbing and murdering Gilbert Ray Mejia on May 8, 1979. It was further alleged that defendant and Ybarra were armed with and used a firearm during the commission of the robbery and of the murder (Pen. Code, §§ 12022, subd. (a) and 12022.5). Additionally, it was charged that defendant and Ybarra had the intent to inflict and inflicted great bodily injury upon Mejia in the commission of the robbery (Pen. Code, § 12022.7). It was separately charged that defendant used a dangerous and deadly weapon, a baseball bat, in the commission of the robbery (Pen. Code, § 12022, subd. (b)). Defendant pled not guilty to both counts and denied all special allegations.

Defendant's motion for separate trial was granted and a jury trial ensued. The jury returned a verdict of guilty as to count one, murder in the first degree, and count two, robbery. However, the jury found all the special allegations not true.

---

[1]The order denying a new trial is reviewable on appeal from the judgment but is not itself appealable. Accordingly, the attempted appeal from the order denying the new trial motion is dismissed.

[2]Codefendant Ybarra is not a party to this appeal. On or about January 31, 1980, Ybarra entered a plea of guilty to a charge of voluntary manslaughter as a result of a plea bargain with the Riverside District Attorney.

Defendant was denied probation and sentenced to prison for the term prescribed by law on the murder conviction and for the upper term of five years on the robbery conviction, the sentence for the robbery to run concurrently with the sentence for murder.

On appeal, defendant does not contend his conviction was not supported by substantial evidence except in connection with his contention that his motion for new trial was erroneously denied. In any event the evidence of defendant's guilt is ample if not overwhelming and we do not feel called upon to set out at length the facts established by the evidence as viewed most favorably to the People. Suffice it to say, the evidence indicated that the victim, Mejia, was first robbed and then killed with his own .25 caliber automatic pistol, for motives having to do with drug trafficking, by defendant, Richard Ybarra, and possibly defendant's cousin Victor Federico at the Riverside home of Rachel Frias, another cousin of defendant, and that the body was then transported in the trunk of a Ford Fairlane owned by Victor Federico to a vacant lot about a mile away where it was ultimately discovered by the police, blindfolded,[3] tied up and partially nude.

An autopsy of the victim's body disclosed four gunshot wounds around the right ear, two of which were the cause of death, and at least five large cranial lacerations that could have been caused by a cylindrical lead pipe or an aluminum baseball bat. The time of death was estimated to be between 5 and 7 a.m. on May 8.

There was considerable evidence incriminating the defendant including the following. There was evidence that the victim and defendant were engaged in drug trafficking. Defendant kept the victim's name and telephone number in an address book and also in his wallet. In defendant's home was his receipt book with the name "Ray" and financial transactions listed. The victim was known as "Ray."

Defendant's father, Preston Federico, lived in the Highland Park area of Los Angeles. He had two telephones. One of his telephone numbers was 213-255-1357. Defendant is also sometimes known as Preston Federico. At the victim's home in Phoenix the police found a notation on some of the victim's papers, the name "Preston" and the telephone number "(213) 255-1357."

---

[3]There was blood on the outside of the blindfold but not the inside, indicating the blindfold was in place before the victim was shot.

In late April or early May the victim had some $8,000 worth of cocaine which had become discolored. He was upset about that and felt he had been cheated by whoever sold it to him. He said he was going to confront defendant's father with the cocaine. Apparently he rode his custom-made motorcycle from Phoenix to the father's house in Los Angeles. He and his motorcycle were seen there on Monday evening May 7.

Defendant, Richard Ybarra and Victor Federico left the defendant's home in Westminster about 4:30 p.m. on May 7 and drove in Victor Federico's Ford to defendant's father's house in Highland Park. They and the victim arrived at the father's house at about the same time, 5 or 6 p.m. The father was unhappy about the visitors and he told the defendant to get those people out of his home. Defendant and the others did not leave, so about 10 or 11 p.m. the father left and spent the night elsewhere. When the father returned home at about 7:30 the next morning defendant, Ybarra and Victor Federico were sleeping on the floor. The father told them to leave, but they did not leave until 5 p.m. at which time they went to the defendant's home taking the victim's motorcycle with them.

Defendant's wife testified that when defendant returned home that evening there were bloodstains on the front of his blue jeans below the knees and that he immediately took off those pants and threw them in the trash. Defendant had worn the same pants the day before and they were then clean, unstained and in fair condition.

Defendant retained possession of the victim's motorcycle and told his cousin Jo Ann Ramirez that he was going to sell it.

About 10 p.m. on Saturday, May 12, Riverside police saw defendant, Ybarra and Victor Federico accompanied by a female come out of a liquor store together. Defendant got on the victim's motorcycle and began to start it. All four were then arrested. Defendant was placed in the far left rear of a patrol car. The next morning the police found the victim's motorcycle registration under the seat of the patrol car where the defendant had been seated. Defendant never explained how he obtained the motorcycle registration or why he hid it in the police car.

At the time of his arrest defendant gave police a phony name, Angelo Carlo Gambino, and a phony address and affected a phony Italian accent.

While defendant was in jail he had a number of conversations with a cellmate, Benjamin Rodriguez, about Mejia's death. At first, the defendant described his arrest and said, "They didn't have nothing on him, that nobody would talk." Later he told Rodriguez the victim was murdered because he was a federal informant. Still later defendant told Rodriguez the victim was murdered because he tried to have defendant arrested. He explained that when defendant, Ybarra and Victor Federico had gone to Arizona some months earlier, the victim had planted cocaine in their car without their knowledge. Defendant said if anyone had anything to do with hitting the victim with a baseball bat, it was he and Ybarra. He also stated the victim was hit in the head with a baseball bat and was shot in the head three times by him. He said he used a .25 automatic. He said the victim was tied, gagged, stripped, put in the trunk of Victor Federico's Ford and dumped.

Defendant's wife testified that defendant took a month long trip beginning in March and ending in April 1979 and that upon his return he told her he had been in Arizona. He then gave her a red and white Mercury automobile and a set of keys to the car which he said he got in Arizona. The car belonged to the victim. After defendant was arrested a key ring was taken from his person. Two keys on that ring operated the victim's Mercury. A second set of keys fitting the Mercury was found at the defendant's home, and his wife testified the set of keys found in the home was the set defendant had given her upon his return from his trip to Arizona.

Defendant testified he did not go to Arizona in March or April, did not tell his wife he had gone there and received only one set of keys when he assertedly obtained the car from Ybarra.

On appeal defendant asserts a number of allegedly prejudicial errors. Preeminent among them are that the trial court erred in permitting Benjamin Rodriguez to testify, in limiting defendant in cross-examining Rodriguez and in denying defendant the opportunity to present other testimony regarding Rodriguez. These contentions are without merit.

■ Prior to jury selection, the court, at the request of defense counsel and with the approval of the prosecution, conducted a hearing pursuant to Evidence Code section 402 to determine the admissibility of the testimony of Benjamin Rodriguez to the effect that, while he was Rodriguez' jail cellmate, defendant had admitted to Rodriguez committing the crimes. Defendant asserted that the statements were hearsay,

that Rodriguez was a police agent and that the probative value of Rodriguez' testimony was outweighed by its prejudicial effect (Evid. Code, § 352). In connection with the undue prejudice argument defendant asserted that Rodriguez had obtained his knowledge of the case from police reports shown him by the defendant, not from admissions by the defendant and that Rodriguez had a substantial motive for lying because he had worked out a plea bargain with the Riverside authorities conditioned upon his testifying in the Federico case.

Outside the presence of the jury the court received evidence on the motion from five witnesses. Defendant filed a memorandum in support of the motion, and argument was heard. Although the court expressly recognized that Rodriguez might have a motive for falsifying, it nevertheless made a preliminary determination that Rodriguez' testimony was credible and ruled that his testimony should be admitted into evidence.

The ruling was eminently sound. The probative value of Rodriguez' testimony if true was enormous. The only possibility of undue prejudice within the meaning of Evidence Code section 352 was that Rodriguez' testimony might be false. However, it is fundamental that the credibility of witnesses is to be determined by the trier of fact, and it was altogether proper for the court, after making its preliminary determination that Rodriguez' testimony was credible, to admit the testimony into evidence, leaving the ultimate determination of credibility to the jury.

■ Defendant also contends the trial court erred in limiting his cross-examination of Rodriguez with respect to criminal charges pending against Rodriguez in Orange County. Not so.

At trial Rodriguez testified he had an agreement with the Riverside County District Attorney: he would be released on his own recognizance and, if he testified truthfully at defendant's trial, charges against him in Riverside would be dismissed. He also testified there were charges pending against him in Orange County, but no agreement had been made as to the disposition of those charges. His testimony in that regard was corroborated by Riverside Assistant District Attorney Hollenhorst, Frederick McBride, attorney for Rodriguez, and Riverside Deputy District Attorney Glickman.

Nevertheless, on cross-examination of Rodriguez defense counsel attempted to elicit *the facts* underlying the Orange County charges.

When Rodriguez admitted he had been shot, defense counsel asked him where, whether he had been shot by police in Orange County, and whether he was taken to a hospital in Orange County after being shot. He also asked if Rodriguez' back pain was the result of gunshot wounds, and if Rodriguez had made any statements to police about the facts in his Orange County case. The court sustained Rodriguez' claim of privilege in each instance.

The court's rulings were plainly correct. Testimony of Assistant District Attorney Hollenhorst revealed that the charges against Rodriguez in Orange County were felonies which involved a shootout with police. It is clear that answers to the aforementioned questions to Rodriguez by defendant's attorney would have tended to incriminate Rodriguez in the Orange County case.

Defendant's argument that he had a right to impeach Rodriguez with reference to the Orange County matter is mistaken. He contends variously that he sought to elicit (1) the details of the charges, (2) the nature of the charges, (3) any plea bargain concerning the charges, and (4) any expectations by Rodriguez that his Riverside testimony might benefit him in his Orange County case.

As to the first point, if "details of the charges" means the facts of the shootout, Rodriguez clearly had a privilege to refuse to answer.

As to the second point, the nature of the charges, defendant did elicit from Rodriguez the fact the Orange County charges were felonies. However, Rodriguez was never asked what the specific charges were. Thus, defendant has no basis for complaint.

As to point three, defendant was permitted to question Rodriguez about the existence of a plea bargain with respect to the Orange County charges. He testified there was none. Defendant has no legitimate complaint on this ground.

Defendant was permitted to ask Rodriguez whether he expected his testimony in Riverside would benefit him in the Orange County case, so he has no basis for complaint with respect to the fourth point either.

█ Finally, defendant contends the court erred in refusing to permit him to present certain witnesses, a deputy district attorney and two po-

lice officers from Orange County to give testimony allegedly relevant to Rodriguez' credibility.

The subject was first raised in reported proceedings, and later in an unreported chambers conference at which both counsel were present, and the prosecutor moved to quash the subpoenas for those witnesses. The court researched the issue and concluded the subpoenas should be quashed. Later, the court permitted further argument on the issue. Finally, the court confirmed its original ruling quashing the subpoenas.

Two of the proposed defense witnesses were police officers from Orange County, Officer Prate and Officer John Moore. Apparently defendant wanted them to testify to the details of the shootout in Orange County in order to show the likelihood that Rodriguez would be convicted in that case. That testimony was supposed to contradict Rodriguez' cross-examination testimony that he did not make a deal on the Orange County case because he thought he could beat the case, and thereby show Rodriguez was a liar.

One basis for the court's excluding the proffered testimony was Evidence Code section 352. The court deemed it too time consuming and more confusing and prejudicial than probative. The court envisioned both parties presenting witnesses and, in effect, trying Rodriguez' case during defendant's trial. Moreover, it is clear the primary impact of evidence of the shootout would have been to depict Rodriguez as a violent person, rather than an untrustworthy witness, in violation of Evidence Code sections 786, 787 and 1101, subdivision (a). The prejudicial effect of such evidence is readily apparent: the jury would have tended to disbelieve Rodriguez on the basis of evidence which had no bearing on his credibility.

The court properly exercised its discretion under section 352 of the Evidence Code.

The other witness whose testimony was excluded was Orange County Deputy District Attorney Janice Cuzzupoli. Apparently defendant expected her to corroborate testimony of witness McBride assertedly to the effect that Rodriguez had sought a deal in Orange County, and thereby to contradict Rodriguez' testimony as to why he did not obtain any deal in Orange County. But McBride did not testify that any deal was sought in Orange County with Ms. Cuzzupoli or anyone else. In fact, McBride refused to disclose any conversations he had with any

Orange County officials. Thus, there was nothing Ms. Cuzzupoli could corroborate.

McBride and Rodriguez both testified the Riverside prosecutor was asked about dropping the Orange County case. But, of course, the Riverside prosecutor could not make any such deal and, in fact, did not even contact Orange County authorities about the matter. It was, therefore, clear that Ms. Cuzzupoli, an Orange County prosecutor, could shed no light on the agreement reached in Riverside.

Exclusion of the proposed "corroborating" testimony of Ms. Cuzzupoli was proper. Since there was nothing for her to corroborate, her testimony would have been irrelevant.

■ The next major contention by defendant and amicus is that the murder conviction must be reversed because of a fatal inconsistency between the verdict of guilty on the murder count and the jury's finding that the allegation that defendant was armed with a firearm in the commission of the murder was not true. In this connection it is pointed out that the uncontroverted evidence establishes that the cause of death was one or more of the shots to the victim's head.

A determination that the accused *used a* firearm in the commission of the charged offense must be based on the accused's personal use of the firearm (Pen. Code, § 12022.5; *People* v. *Walker* (1976) 18 Cal.3d 232, 240-243 [133 Cal.Rptr. 520, 555 P.2d 306]), so there was no inconsistency between the jury's finding that the defendant did not use a firearm in the commission of the murder and its verdict of guilty on the murder charge. However, an allegation that the accused was armed with a firearm in the commission of the charged offense may be found true even though the accused did not personally have possession of the firearm if an accomplice or coconspirator was armed with a firearm during the commission of the offense. (Pen. Code, § 12022; see *People* v. *McGreen* (1980) 107 Cal.App.3d 504, 524 [166 Cal.Rptr. 360].) Since the uncontroverted evidence establishes that the victim was killed by one or more shots to the head, it must be conceded that the jury's finding that defendant was not armed in the commission of the murder was logically inconsistent with its verdict that he was guilty of the murder. The real question is the effect of the inconsistency. We conclude that it constitutes no grounds for reversal of the murder conviction.[4]

---

[4]There was no inconsistency between the conviction on the robbery count and the jury's determination that the allegation that defendant was armed with a firearm during

In apparent response to several appellate decisions in which it was claimed that verdicts on two counts were fatally inconsistent and that reversal of conviction was required, Penal Code section 954 was amended in 1927 to add as its final sentence: "A verdict of acquittal of one or more counts shall not be deemed or held to be an acquittal of any other count."[5] (Stats. 1927, ch. 611, § 1, p. 1042; see *People* v. *Amick* (1942) 20 Cal.2d 247, 250-253 [125 P.2d 25].) The purpose of the 1927 amendment to Penal Code section 954 was clearly stated in *In re Johnston* (1935) 3 Cal.2d 32, 36 [43 P.2d 541]: "The proviso was written into the section for the purpose of declaring the law that a verdict apparently inconsistent shall afford no basis for a reversal where the evidence is sufficient to support the conclusion that the defendant is guilty of the offense of which he stands convicted." (Accord: *People* v. *Amick, supra*; *People* v. *Hamilton* (1978) 80 Cal.App.3d 124, 130 [145 Cal.Rptr. 429].)

There is recognized a limited exception to the rule where "all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, *and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty.*" (*People* v. *Hamilton, supra*; italics added.) The exception is, of course, inapplicable in the case at bench; technically it was not necessary to prove that either defendant or Ybarra was armed with a firearm to support a conviction of murder. In any event, "section 954 provides that verdicts may be sustained, even if they are inconsistent in fact." (*People* v. *Greer* (1947) 30 Cal.2d 589, 599 [184 P.2d 512], and cases there cited.)

While strictly speaking the allegation that defendant was armed in the commission of the murder did not charge a separate offense, we believe the principles found in Penal Code section 954 and the cases interpreting it are applicable in resolving the logical inconsistency between the not true finding of the armed allegation and the guilty verdict

---

the robbery was untrue because the jury might well have determined that the robbery occurred before the perpetrators came into possession of the pistol which the evidence established belonged to the victim, indeed that the perpetrators obtained the gun in the robbery (see discussion, *infra*). (*People* v. *James* (1937) 20 Cal.App.2d 88, 90-91 [66 P.2d 461].)

[5]In its present form, the concluding sentence of section 954 now reads: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." (Stats. 1951, ch. 1674, § 45, pp. 3836-3837.)

on the murder charge. As stated by the Supreme Court in *People* v. *Amick, supra*: "'"[W]e find more persuasive cases recognizing that such inconsistent verdicts may be caused not by the confusion but the mercy of the jury, of which the appellant can neither complain nor gain further advantage. (Citing cases.) Moreover, probably to avoid the result of those cases which interpret inconsistent verdicts as acts of stupidity rather than acts of leniency, section 954 of the Penal Code was amended in 1927 so that it now reads, (as above quoted) 'we conclude that even if the dismissal be regarded as an acquittal, that is no reason why the judgment of conviction, based on ample evidence, should be reversed.'" . . . .'" (20 Cal.2d at p. 252, quoting from *People* v. *Horowitz* (1933) 131 Cal.App.Supp. 791, 793 [19 P.2d 874].)

The evidence was plainly sufficient to support defendant's conviction of murder. The negative finding on the armed allegation was a determination more favorable to the defendant than the evidence warranted. It does not compel reversal of the murder conviction. (Cf. Pen. Code, § 954; *People* v. *Amick, supra*, 20 Cal.2d at pp. 250-253; *In re Johnston, supra*, 3 Cal.2d at p. 36; *People* v. *Hamilton, supra*, 80 Cal.App. 3d at pp. 128-130.)

■ Next, defendant asserts instructional errors. He contends the trial court erred in failing to instruct, *sua sponte*, on second degree felony murder and theft as a lesser included offense to robbery. As to the latter defendant's premise is that because the jury did not find that he was armed with or used a deadly weapon in the commission of the charged offenses, it must have necessarily concluded that he used neither force nor fear in taking the victim's property. Thus, he contends the jury should have convicted him of theft, not robbery, and that the jury should have been instructed on that offense. We disagree.

Defendant's premise is unsound. It was not necessary for the jury to find that defendant was armed with or used a deadly weapon to find him guilty of robbery by force or fear. The evidence established that the victim almost always carried with him the .25 caliber automatic pistol with which he was killed. A reasonable if not necessary inference from the evidence is that defendant and Ybarra took the gun from the victim and shot him with it. It is a virtual certainty that the victim did not voluntarily part with the gun and that it was taken from him by the use of force or by threats of the use of force.

The duty of a trial court to instruct *sua sponte* was accurately summarized in *People v. Cram* (1970) 12 Cal.App.3d 37, 41 [90 Cal.Rptr. 393]: "In the absence of a request, the trial court must instruct on the general principles of law relative to the issues raised by the evidence but need not instruct on its own motion on specific points developed at the trial. The general principles of law covering the case are those commonly or closely and openly connected with the facts of the case. The trial court is not required to anticipate every possible theory that may fit the facts or fill in every time a litigant or his counsel failed to discover some obscure, but possible, theory of the facts. There must be *substantial* evidence on the issue sufficient to alert the trial judge that it is an issue in the case." (Orig. italics; accord: *People v. Ray* (1975) 14 Cal.3d 20, 25 [120 Cal.Rptr. 377, 533 P.2d 1017]; *People v. Sedeno* (1974) 10 Cal.3d 703, 716-717 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another point in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) Further, the court should not render *sua sponte* instructions that are inconsistent with the defendant's theory of the case. (*People v. Ray, supra; People v. Sedeno, supra.*)

There is no substantial evidence that the crimes committed were theft or second degree felony murder. The evidence established that the victim was beaten, that his pistol was taken from him and that he was tied up, blindfolded and executed by four shots near the right ear. The crimes were robbery and first degree murder; the only question was who committed the crimes.

Moreover, instructions on theft and second degree felony murder would clearly have been inconsistent with the defendant's theory of defense. At trial, defendant asserted an alibi, claiming he was not present at the time and place of the crime. His defense was not that he committed theft rather than robbery or second degree rather than first degree murder. As the court in *Sedeno* stated: "[T]he duty to give instructions, *sua sponte*, on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Indeed, this limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*People v. Sedeno, supra,* 10 Cal.3d at p. 716; accord: *People v. Ray, supra,* 14 Cal.3d at p. 25.)

■ Defendant also contends that the court improperly instructed the jury on "aiding and abetting"[6] because there was no proof of the identity of the principal perpetrator of the alleged crimes. Defendant argues that a conviction of aiding and abetting requires proof that defendant was aware of the perpetrator's criminal intent and assisted or encouraged the perpetrator in the commission of the charged offenses and that, if the perpetrator was not identified the jury could not find that defendant was aware of the perpetrator's intent. Not so.

From the evidence, it is clear that either defendant or Ybarra was the actual perpetrator of the robbery and the murder. Assuming, as defendant suggests, that the jury convicted him on a theory of aiding and abetting Ybarra, two things are abundantly clear. Ybarra intended to rob and kill the victim and substantial evidence abounds that would support an implied finding that defendant participated in the crimes with knowledge of Ybarra's wrongful purpose and intent.

The trial court fully instructed the jury on aiding and abetting including the admonition that "[m]ere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting." The aiding and abetting instructions were entirely proper.

■ Defendant's remaining contentions relate to the trial court's denial of his new trial motion. First, he contends the court should have granted a new trial on the basis of newly discovered evidence. Not so.

---

[6]CALJIC Nos. 3.00 and 3.01 were given with respect to "aiding and abetting."

CALJIC No. 3.00 (4th ed. 1979) provides: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:

"1. Those who directly and actively commit or attempt to commit the act constituting the crime, or

"2. Those who, with knowledge of the unlawful purpose of the one who does directly and actively commit or attempt to commit the crime, aid and abet in. its commission or attempted commission, or

"3. Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission or attempted commission.

"[One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.]"

CALJIC No. 3.01 (4th ed. 1979) provides: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [Mere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting.]"

The new evidence consisted solely of the testimony of Richard Ybarra with whom the defendant was jointly charged in the information. The two were granted separate trials. Defendant was convicted on December 21, 1979. On or about January 31, 1980, Ybarra pleaded guilty to voluntary manslaughter pursuant to a plea bargain. Approximately one month later on February 29, 1980, Ybarra testified in support of defendant's motion for new trial that he murdered Gilbert Mejia and that defendant was not present. The trial court concluded that Ybarra was lying. It stated: "I don't believe any of his story is correct so far as Mr. Federico not being there and involved."

The court had ample reason for rejecting Ybarra's testimony. It was absolutely inconsistent with the detailed statements Ybarra had made to the police in which he portrayed defendant not only as a participant but as the principal perpetrator of both crimes.[7] His explanation for recanting was feeble. Moreover, Ybarra did not know a great many details surrounding and pertaining to the murder that he certainly would have known had he alone committed it. In addition, there were indications that Ybarra's recantation stemmed from his fear that otherwise he would be killed in prison as a "snitch." Indeed, there was testimony that Ybarra had learned that defendant had threatened to kill him in prison.

A motion for new trial is addressed to the sound discretion of the court, and its denial will not be disturbed on appeal except on a showing of clear abuse. (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 177-179

---

[7]Ybarra stated, in part: "The victim was awakened and accompanied to the area near the corral located to the rear of the [Frias] residence. At that point [defendant] and Danny Frias engaged the victim in conversation about the horses. As Danny Frias was directing the victim's attention to the horses, [defendant] walked to a tree behind the victim, picked up a baseball bat, walked up behind the victim and struck the victim very hard over the head with the bat. The victim fell to the ground and Danny Frias placed his knee on the victim's neck to hold him down. Ybarra stated that he next saw [defendant] go through the victim's clothing and take a .25 caliber automatic pistol from the victim's person. Ybarra states he cannot remember the exact sequence of the events, but that both [defendant] and Danny Frias struck the victim's head with the baseball bat. [Defendant] at some point during the beating removed all the victim's clothing, tied, blindfolded and gagged the victim. [Defendant] used rope that he got from the previously mentioned skinny person. The reason he was gagged was because he was still moaning and making noises. [Defendant] then told the skinny person to get him a pillow. Instead, the skinny person returned with some rags and handed them to [defendant]. [Defendant] then knelt down by the victim and placed the pistol to the victim's head. After using the rags to cover the pistol, [defendant] shot the victim twice in the head. The victim continued to make gurgling noises for several minutes. [Defendant] then shot the victim twice more in the head."

[127 Cal.Rptr. 467, 545 P.2d 843].) There was no abuse of discretion in the trial court's denying defendant's motion for new trial on the ground of newly discovered evidence.

■ Defendant's contention that the court should have granted his motion for new trial on the ground of insufficiency of the evidence is patently unmeritorious. As previously stated, it is not true that one may not be convicted of an offense as a principal under an aiding and abetting theory when the actual perpetrator has not been specifically identified. In the case at bench either the defendant or Ybarra was, or both of them were, the actual perpetrator or perpetrators, and the evidence amply supports the inference that defendant participated in the commission of the crimes or at the very least was present for the purpose of aiding and abetting in their commission with the knowledge that the actual perpetrator intended to commit them. Contrary to defendant's apparent belief, eyewitnesses to the crime were not required.

■ The assertion that the robbery conviction is not supported by substantial evidence because the prosecution did not establish precisely when it occurred or what personal property was taken is devoid of merit. Although the Attorney General refers to several items of property as having been taken in the robbery—clothing, keys, the motorcycle registration and the victim's .25 caliber automatic pistol, we need deal only with the pistol. The evidence established that the victim almost invariably carried the pistol with him; it is a reasonable inference therefore that it was taken from his person; obviously it was taken from him before he was killed, because it was used in killing him; finally the jury, and the court on motion for new trial, could reasonably infer from the evidence that the pistol was taken from the victim by force or threats of force.

■ Finally, defendant contends that a new trial should have been granted because of communications allegedly received by several jurors that assertedly intimidated the jury. The record on this subject is quite sparse; it shows the following. The presentation of trial evidence began on November 28 and ended on December 17, 1979. Jury deliberations began on December 19 and the verdicts were rendered on December 21, 1979. At that point nothing in the record makes any reference to intimidation of jurors.

On December 26, 1979, five days after the verdicts, defendant's trial counsel filed a declaration and petition for appointment of an investiga-

tor. It alleged that immediately prior to the jury's being called into court to announce its verdict he learned from the prosecutor of apparent incidents of interference or intimidation of one or more jurors. It alleged counsel was advised the prosecutor and the court received the information because one or more jurors discussed it with the court reporter. Counsel requested in the declaration that he be empowered to employ an investigator to contact members of the jury to determine if there was a factual basis for jury misconduct as a ground for a motion for new trial.

Counsel's proposed order in that regard was crossed out, and the court noted "the sheriff is investigating."

On January 30, 1980, defendant's counsel filed a motion for new trial. Therein he stated misconduct or intimidation of the jury as a ground. The motion for new trial was argued on February 29, 1980. At that time no argument was made nor evidence presented on the subject of jury misconduct or intimidation.

The law is reasonably clear. A rebuttable presumption of prejudice to a defendant may arise from a showing of misconduct by jurors, as in *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050] (juror obtained legal advice from outside attorney) and *People* v. *Pierce* (1979) 24 Cal.3d 199 [155 Cal.Rptr. 657, 595 P.2d 91] (juror questioned a witness about the evidence). It may also arise from a showing of attempts by outsiders to influence jurors, as in *Remmer* v. *United States* (1954) 347 U.S. 227 [98 L.Ed. 654, 74 S.Ct. 450] (attempt to bribe juror). However, when the alleged misconduct involves an unauthorized communication with or by a juror, the presumption does not arise unless there is a showing that the content of the communication was about the matter pending before the jury, i.e., the guilt or innocence of the defendant. (See *United States* v. *Gross* (3d Cir. 1980) 614 F.2d 365, 368 (interpreting *Remmer*), cert. den. (1980) 447 U.S. 925 [65 L.Ed.2d 1118, 100 S.Ct. 3019]; *People* v. *Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752]; *People* v. *Phelan* (1899) 123 Cal. 551, 567-568 [56 P. 424].)

In the instant case there was no showing any jurors were contacted by outsiders about the matter pending before them. There was merely an undetailed declaration of defendant's trial counsel, based upon third or fourth hand information, that one juror had received an "apparently threatening" telephone call and another juror received a Santa Claus fi-

gurine with a noose around its neck. The trial court was entitled to disregard such hearsay. (*People* v. *Phelan, supra*, 123 Cal. at pp. 567-568.)

Furthermore, defendant failed to pursue his remedies in the trial court. By his own admission in his declaration, defendant's trial counsel learned of the alleged tampering before the verdict was rendered. That fact distinguishes this case from *Remmer* v. *United States, supra, People* v. *Honeycutt, supra*, 20 Cal.3d 150, and *People* v. *Pierce, supra*, 24 Cal.3d 199. If the matter were thought to constitute a threat to the integrity of the jury's deliberative process, defendant could and should have immediately moved for a mistrial or a hearing on the matter or a substitution of jurors. There were two alternate jurors available for substitution had defendant acted in a timely manner.

Defendant also failed to pursue his postverdict remedies. Although he did file a motion for a new trial citing juror intimidation as a ground, and did present one witness on another point at the hearing on the motion, he failed to subpoena any of the jurors or to present any other witnesses (e.g., the bailiff or the prosecutor) to establish a factual basis for his claim. Indeed, he did not even argue the issue of juror intimidation at the hearing on the motion for new trial.

Defendant's claim that the court abused its discretion in denying his request to appoint a defense investigator to investigate the possibility of jury intimidation is not meritorious. Since, as the court noted, the sheriff was already investigating the matter, the court was not legally compelled to authorize a second investigation. The matter involved the possible commission of a crime, violation of Penal Code section 95, and it was appropriate that the sheriff make the investigation. No claim is made that the information developed by the sheriff's investigation was not available to the defendant.

Defendant's claim that the court erred in failing to examine the jurors fails; defendant did not ask the court to examine the jurors. Defendant makes no persuasive showing that the trial court knew of the problem before the verdict was rendered. If it was ignorant of the problem then, the court obviously was not in a position to exercise its discretion in respect to the problem at that time. Although the court clearly was apprised of the problem when defendant filed his declaration on December 26, 1979, that event did not impose a duty upon the

court to subpoena the jurors for examination on its own motion. The production of witnesses is within the power of the parties.

In summary, there was no showing any juror was subjected to intimidation, no basis for a presumption of prejudice, no abuse of discretion by the court, and no denial of a fair trial. Defendant was not entitled to a new trial. Nor is a remand for a hearing on the question indicated. The factual predicate is wholly speculative.

The judgment is affirmed.

Gardner, P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied January 7, 1982, and appellant's petition for a hearing by the Supreme Court was denied March 25, 1982.