[No. F008218. Fifth Dist. July 12, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY WILEY DAVIS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part II.

COUNSEL

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael J. Weinberger, Susan Rankin Bunting and Ruth Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

BROWN (G. A.), J.*—Appellant Rodney Wiley Davis was convicted of second degree murder (Pen. Code, § 187)[1] and an allegation that he had personally used a handgun within the meaning of section 12022.5 was found to be true. He was sentenced to 17 years to life. He appeals from the judgment. We will affirm.

FACTS

On May 11, 1986, about 4:30 p.m., appellant shot and killed Tyrone "TC" Carter. The men were longtime friends and both were experienced in the martial arts with black belts in karate. They frequently attended the same martial arts training events. Appellant claimed he shot in self-defense when TC cut him with a "butterfly knife."

TC had moved from Bakersfield to Los Angeles but he frequently returned to Bakersfield to visit a girlfriend and to work with Jerry and Rick Romine in their repossession and security business.

There had been angry confrontations between TC and appellant in the days before the shooting. A week before the shooting, appellant and TC argued about money at Rick Romine's house where appellant was staying. TC pulled a butterfly knife (hereafter described) before Rick broke up the fight. TC said, "There will be another time and another place when we will finish this."

On the day of the shooting, TC and his girlfriend, Patricia "Gail" Payton, were staying at Shirley Williams's house. Appellant arrived and the

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Penal Code unless otherwise specified.

men began arguing about money that appellant claimed TC owed him. Gail called A.J., a friend of the victim, to stop the fight. TC had removed his shoes in preparation for a martial arts battle. A.J. told appellant to go about his business and appellant left.

TC and Gail then went to the home of Sylvia Lucky who had had two children with appellant. Wilson "Papa" Spry was living with Sylvia. While TC visited with Papa, Gail went out to wait in the car. She saw appellant park nearby and went to tell TC they ought to leave. TC came out to the sidewalk and took off his shoes, apparently anticipating a martial arts confrontation. According to Gail, TC had nothing in his hands. Appellant got out of his car and walked up to TC. Gail heard a gunshot. TC returned to the yard and fell under a tree.

Papa testified he had known appellant and TC for about 14 years. He and appellant had had run-ins in the past. Papa had beaten appellant at martial arts. On Sunday, May 11, 1986, about 3 p.m., he was visiting with TC at Sylvia's house. TC left when Gail reported that appellant was outside. Papa put on his shoes and shirt and followed five to seven minutes later. On his way out, he heard a gunshot. He saw appellant speed away in his car and TC run into the yard. TC was bleeding from his chest and hand. Papa did not see anything in TC's hand when TC left the house or after the shooting.

Willie Clayton and her daughter, Mona Thompson, were walking in the neighborhood. They were approximately 440 feet from the action. Ms. Clayton saw a brown car stop. The driver got out and approached a man walking on the sidewalk. They did not see him return to the car and then return to the scene. Ms. Clayton saw nothing in either man's hands but could tell they were arguing. She heard one shot. The man returned to his car and drove away rapidly. She did not see anyone go near the immediate area of the shooting or pick up anything.

Bakersfield police officer Michael Fabrizius responded to the scene of the shooting within five minutes. He saw the victim lying in the front yard with a gunshot wound to his chest. Paramedics were able to temporarily revive TC. Officer Fabrizius told TC he was going to die and asked him to name the person who shot him. TC kept repeating "Rodney Davis."

A number of people gathered across the street. Fabrizius called for assistance and responding units helped him rope off the area. Later he found a pair of shoes in the street but did not locate the spent cartridge or the knife that TC purportedly had.

The Kern County pathologist autopsied the body and determined that TC died of a gunshot wound to his heart. TC also had a wound in his right

hand. The single bullet had entered the palm and exited the back of the hand and entered the chest. The pathologist opined that the victim could not have been holding something in his right hand when he received the wound.

Appellant testified he shot TC in self-defense. TC was the better martial arts fighter and owned a large butterfly knife with an 18-inch blade which was sharpened on both sides. (A defense expert described a butterfly knife as one with a handle that breaks apart exposing a blade that comes from the center.) Appellant claimed TC kept the knife with him and used it often. This was confirmed by others but TC's wife, his brother and girlfriend said he did not own such a knife.

On the day of the shooting, appellant borrowed Rick Romine's Ranchero not realizing that Rick, a gun collector, had forgotten to remove a small handgun from beneath the seat. Rick confirmed that both the gun and the Ranchero were his. He drove to Sylvia's house to see his children. He testified he did not expect TC to be there.

TC came out of the house and started yelling. Appellant pulled over and left the Ranchero. TC and Papa were walking toward him together. Appellant and Papa were not friends. They had argued in the past and Papa had beaten appellant. TC had something in his right hand. Appellant was afraid so he returned to the car to get a chain or another tool to protect himself. He found the gun and returned to TC. He intended to use the gun as "a show of force." The men continued to argue. TC cut appellant's left hand with his knife. Appellant then raised the gun and shot TC. He fired because TC had cut him and he feared he might sustain serious injury or death from the knife if he did not shoot TC.

In a panic, he jumped into the Ranchero and sped away. He threw the gun into a canal and went home. He suffered two cuts on his left hand in the webbing between his thumb and first finger.

Officer Waidelich of the Bakersfield Police Department observed the scars on appellant's left hand several months after the shooting. He testified the two scars were consistent with a "slide-bite injury." Such injury occurs when a weapon like the one used by appellant is held incorrectly. To eject the spent cartridge, the slide moves back. It hits the "weak hand" (the left hand if the operator is right-handed) and creates two cuts nine-sixteenths of an inch apart. In addition, if the slide is impeded, it can cause the weapon not to eject the spent case. Appellant's scars were approximately nine-sixteenths of an inch apart.

Appellant maintained he held the gun with one hand and was not injured by the firearm. A defense expert opined that appellant's scars were not caused by a slide-bite injury. He would expect puncture wounds rather than slice wounds which appellant had.

## DISCUSSION

We will discuss the many issues raised by appellant seriatim.

### I.

*Must the second degree murder conviction be reversed because the jury found appellant not guilty of manslaughter?*

The jurors were instructed on first degree premeditated murder, second degree murder, voluntary manslaughter and involuntary manslaughter. They were also instructed pursuant to CALJIC No. 8.75 that they were to address the possible homicide verdicts in decreasing order of severity. First, they must reach unanimous agreement on first degree murder, if possible. If they agreed the verdict was guilty, their task was complete. If they agreed on a not guilty verdict, they signed that verdict and moved on to the second degree murder charge. The process was to be repeated downward through the two manslaughter verdicts until the jury had agreed on a verdict of guilty at some level, deadlocked at some level, or agreed on a verdict of not guilty at all levels.

In violation of the instruction, the jury returned verdicts of not guilty of first degree murder, guilty of second degree murder, not guilty of voluntary manslaughter, and not guilty of involuntary manslaughter. Once the guilty of second degree murder verdict was read, defense counsel waived further reading of the verdict form. The court noted the jury had found defendant not guilty of voluntary and involuntary manslaughter but added, "I think that is moot at this time." The jury was polled and all members agreed that guilty of second degree murder was their verdict. The verdict was then recorded in the court minutes.

The jury foreman signed the not guilty of first degree murder verdict on November 25, 1986, at 10 a.m. She signed the guilty of second degree murder verdict and the not guilty of voluntary and involuntary manslaughter verdicts on November 26, 1986, at 10:58 a.m.

Appellant contends the second degree murder conviction must be reversed because it is inconsistent with the acquittal on the lesser-included offenses. The Attorney General acknowledges that the not guilty of man-

slaughter verdicts were procedurally incorrect but hypothesizes that the jury signed them because it "must have felt the need to tidy up [its] task by completing the additional jury forms." Thus, the manslaughter verdicts were surplusage and should not affect the second degree murder conviction.

The Attorney General submits this case is analogous to *People* v. *Allen* (1974) 41 Cal.App.3d 821 [116 Cal.Rptr. 493], where the court disregarded a jury finding made in contravention of instructions as surplusage. Defendant was charged with attempted murder (count I) and assault with a deadly weapon (count II) arising out of one incident in which the victim was shot in the chest with a .22 revolver. Defendant was also charged with use of a firearm (§ 12022.5) as to each count. After trial, the jury acquitted defendant of attempted murder. Although the jury was instructed to make findings on the question whether defendant used a firearm only if it found him guilty on both or either count, it found that it was "not true" that defendant used a firearm at the time of the commission of the attempted murder (count I). The jury deadlocked on the other verdicts and the court declared a mistrial on the assault with a deadly weapon charge. (*Id.* at p. 823.)

The issue on appeal was whether the jury's finding, in connection with the acquittal on count I that defendant was not using a firearm, barred retrial on count II. The People conceded that if the jury legally found that defendant did not use a gun in connection with the attempted murder count, the prosecution would be barred from retrying the assault count because the weapon was the same.

The court held the jury's special verdict was surplusage, just as in situations where the jury recommends leniency in a verdict. In leniency situations, the jury's recommendation is extraneous because punishment is not a jury function and thus beyond the scope of its duties. Likewise, when the jury made a special finding after reaching a verdict of not guilty, which it should have made only if it found defendant guilty, the finding would be discarded as beyond the scope of its duties. (41 Cal.App.3d at p. 826.)

After acknowledging that the internal operations of a jury are rarely subject to scrutiny, the court proceeded to analyze the jury's probable actions. The court concluded the jury forgot that under the court's instructions it could throw away the "used a handgun" verdict relating to count I once it had acquitted defendant on that count. "[F]eeling that it had to do something more ceremonial with all verdict forms relating to count I and unable to say that defendant used a gun in committing an offense of which he was to be acquitted, the jury found—quite logically—that in not committing the offense he did not use a firearm." (41 Cal.App.3d at p. 827.)

Appellant responds that *People* v. *Allen* is not controlling because the inconsistency in this case involves an acquittal verdict. ■ A defective verdict of acquittal cannot be reconsidered. (§ 1161; *People* v. *Romero* (1982) 31 Cal.3d 685, 693 [183 Cal.Rptr. 663, 646 P.2d 824].)

■ This is not a case of verdict reconsideration. The issue is whether the verdict is so inconsistent as to amount to reversible error. (*People* v. *Doxie* (1939) 34 Cal.App.2d 511, 512-513 [93 P.2d 1068].)

We have found no California case directly on point. However, several cases are instructive and lead us to the conclusion that appellant's conviction should not be reversed.

■ Section 954 provides that a verdict of acquittal of one count shall not be deemed to be an acquittal of any other count. Therefore, a verdict of conviction on one count which appears inconsistent with a verdict of acquittal on another count affords no basis for a reversal where the evidence is sufficient to support the conclusion that the defendant is guilty of the offense of which he stands convicted. (*In re Johnston* (1935) 3 Cal.2d 32, 36 [43 P.2d 541].)

Appellant correctly points out that this case does not involve inconsistent verdicts on different counts. However, when the jury is given four different crimes with which it may find defendant guilty or not guilty under one count of homicide, the case is logically indistinguishable from a case in which a greater offense and a lesser included offense are charged in separate counts. (*Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 517-518 [183 Cal.Rptr. 647, 646 P.2d 809].)

In *People* v. *Federico* (1981) 127 Cal.App.3d 20 [179 Cal.Rptr. 315], the victim died as a result of a gunshot wound to the head. Defendant was found guilty of murder, but the jury found the special allegation that defendant was armed with a firearm not true. The court concluded that the factual inconsistency between the jury's conclusions did not create reversible error.

"While strictly speaking the allegation that defendant was armed in the commission of the murder did not charge a separate offense, we believe the principles found in Penal Code section 954 and the cases interpreting it are applicable in resolving the logical inconsistency between the not true finding of the armed allegation and the guilty verdict on the murder charge." (127 Cal.App.3d at pp. 32-33.)

Even if the not true finding was regarded as an acquittal, there was no reason why the judgment of conviction based on ample evidence should be

reversed. The negative finding was a determination more favorable to the defendant than the evidence warranted. It did not compel reversal of the murder conviction. (127 Cal.App.3d at pp. 32-33.)

In *People* v. *Soto* (1985) 166 Cal.App.3d 428 [212 Cal.Rptr. 425], this court reversed a murder conviction where the jury returned a verdict finding defendant not guilty of count I, murder, but fixing the offense as murder in the second degree. (*Id.* at pp. 435-436.)

The court considered the legal effect of the verdict and noted that the form of the verdict was immaterial if "the intention to convict of the crime charged [was] unmistakenly expressed." However, Penal Code section 1162 provides that "no judgment of conviction can be given unless the jury expressly find against the defendant upon the issue . . . ." Thus, since there was no express finding of second degree murder against the defendant, his conviction had to be reversed. (166 Cal.App.3d at pp. 437-438.)

*Soto* is distinguishable from the case at bar because appellant's jury expressly found him guilty of second degree murder. Moreover, the jury foreman signed the guilty of second degree murder verdict form at the same time she signed the not guilty of manslaughter verdicts. She, no doubt, expressed the jury's conclusion that defendant was "not guilty" of first degree murder or manslaughter. Rather, the evidence justified his conviction of second degree murder.

Appellant does not challenge the sufficiency of the evidence to support that conviction. He argues, in effect, that his conviction should be reversed because of a technical error—the jury filled in the two manslaughter verdicts rather than leaving them blank as it was instructed to do once it reached a guilty verdict on one of the murder counts. Appellant suffered no injustice because of the errors and we can think of no policy which would be served by reversing appellant's conviction based on this clearly procedural error. Under article VI, section 13 of the California Constitution no judgment should be set aside or new trial granted for an error in procedure unless, from the whole record, the court can say there has been a miscarriage of justice. Appellant was convicted of second degree murder which was clearly the jury's intent. There was no miscarriage of justice.

## II.*

### *Instructional Error*

. . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Best, Acting P. J., and Ardaiz, J., concurred.

A petition for a rehearing was denied July 27, 1988, and appellant's petition for review by the Supreme Court was denied October 13, 1988.

---

*See footnote, *ante,* page 1009.