[No. A037224. First Dist., Div. Two. Dec. 29, 1988.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMES PETTAWAY, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John Sugiyama, Assistant Attorney General, David D. Salmon, Clifford K. Thompson, Jr., and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Appellant.

Renee E. Torres, under appointment by the Court of Appeal, Robert K. Calhoun, Jr., Neoma Kenwood and J. Bradley O'Connell for Defendant and Respondent.

## OPINION

BENSON, J.—Pursuant to Penal Code section 1238, subdivision (a)(8), the People appeal from the trial court's dismissal of a murder charge against defendant James Anthony Pettaway. We will reverse the judgment. In doing so we will disagree with *People* v. *White* (1986) 185 Cal.App.3d 822 [231 Cal.Rptr. 569], an opinion rendered by our colleagues in Division Five of this District. ■ We hold that where a defendant has been convicted of first degree murder at his first trial and that conviction is reversed on appeal because of instructional error, the defendant may be retried as the murder perpetrator despite negative jury findings, at the first trial, on the personal use of a handgun and personal infliction of great bodily injury enhancement allegations.

Our summary of the pertinent underlying facts in this case is taken from an earlier unpublished appellate decision by Division One of this District following defendant's conviction of first degree murder and attempted murder. On May 1, 1981, defendant and his girlfriend Lowana Walker were at the home of Karen Taylor. Another man, Michael Seals, was also present. At some point, Lowana handed defendant a gun and defendant shot Michael in the back of the neck. Michael then fainted. When he regained consciousness, he saw defendant and Lowana leave through the front door. Karen's dead body was later found in the bathroom. She had been shot twice.

Defendant was charged with one count of murder and a second count of attempted murder. The information also alleged as enhancements, personal use of a handgun (Pen. Code, § 12022.5) and personal infliction of great bodily injury (Pen. Code, § 12022.7) during the commission of both offenses. The prosecution tried the case on the theory that defendant had been the perpetrator of both shootings. Neither party requested and the trial court initially did not give instructions on aiding and abetting. However, during the third day of deliberations the jury requested the following: "Please explain the law concerning complicity, for example, in this case may the defendant be convicted of murder or attempted murder without having personally fired the bullets?" The court, responding to this inquiry, then instructed in accordance with former CALJIC Nos. 3.00 and 3.01. Thereafter, the jury returned verdicts of guilty for both the first degree murder and the attempted murder. With respect to the personal use of a handgun and great bodily injury allegations, the jury found them to be true as to the attempted murder but not true as to the murder.

On appeal, Division One of this court reversed defendant Pettaway's murder conviction for *Beeman* error (*People* v. *Beeman* (1984) 35 Cal.3d

547 [199 Cal.Rptr. 60, 674 P.2d 1318]), i.e., that the language of CALJIC 3.01 as it then existed "removed from the jury's consideration the issue of whether appellant shared in the intent to commit murder." The attempted murder conviction remained undisturbed.

On remand the public defender, relying principally on *People* v. *White, supra,* 185 Cal.App.3d 822, moved to preclude the prosecutor from proceeding to trial on a theory that defendant shot Karen and from referring to defendant as the actual killer. The public defender argued that because the jury determined not true the enhancement allegations with respect to the murder charge, the principles of res judicata, collateral estoppel and/or equitable estoppel, double jeopardy and due process required that result. The trial court, determining that it was bound by *People* v. *White, supra,* 185 Cal.App.3d 822, agreed with the defendant's position and, since the prosecution refused to proceed on an aider and abettor theory, dismissed the murder count against defendant.

On appeal the People concede that defendant may not be retried on the enhancement allegations that the jury found not true. They contend, however, that the trial court erred in ruling that evidence demonstrating defendant was the actual perpetrator in Karen's killing could not be used when retrying the murder count. They argue that *People* v. *White, supra,* 185 Cal.App.3d 822, was wrongly decided or at least distinguishable from the ruling below.

During the hearing of defendant's motion it was the prosecutor's position that he could not in good faith urge any theory to the trier of fact other than that defendant had shot and killed Karen. The prosecutor recited to the court the substance of the evidence available to support his position. A summary of that offer is as follows:

> Michael's testimony that he saw defendant "secure possession of a handgun and walk behind him almost immediately preceding Michael being shot from behind;"

> Michael's testimony that "he saw no other persons in the room, no other persons in the house other than himself, Karen . . . [Lowana] . . . and the defendant"; that "when he was shot . . . he was looking at Karen Taylor who was alive and well and [Lowana] Walker";

> ballistic testimony that "the expended cartridges found in the house were .32 caliber Winchester Western slugs. When [defendant] was

arrested . . . in the state of Texas . . . he was found in possession of .32 caliber Winchester Western ammunition, seven cartridges to be exact";

testimony from defendant's employer that ". . . during the time of this particular incident . . . [defendant] acknowledged being in possession of [the employer's] gun which, in fact, was the murder weapon";

circumstantial evidence ". . . that the same weapon [used to shoot Michael] was also the weapon that killed Karen Taylor";

that the "cartridges that [defendant's employer] kept with the gun, . . . some of that ammunition was missing. . .";

that Lowana Walker, had given a tape-recorded statement to the Oakland police department wherein she stated: "that she was present, and saw [defendant] go behind Michael Seals and shoot him from behind . . . that [defendant] then chased Karen Taylor into a back room. [Lowana] remained in the dining room . . . she heard approximately four shots and after approximately 10 or 15 minutes of silence . . . she went to the bathroom and saw the defendant . . . standing over Miss Taylor's body with the . . . gun";

that while Lowana "had invoked the Fifth Amendment privilege" at the preliminary hearing and during the first trial, she "is presently available and willing to testify in accordance with the taped statement. . . ."

Because we have profound disagreement with the holding reached by our colleagues in *People* v. *White, supra,* 185 Cal. App.3d 822, a case concerning the identical issue we are called upon to address, it is appropriate to begin our discussion with a review of the *White* decision. The case involved a drug-related double murder. Defendant White was apprehended, tried and convicted of two counts of first degree murder and firearm possession. However, the jury found the firearm-use allegations not true. An appeal followed and the murder convictions were reversed due to the improper admission of hearsay testimony. The case was retried and the jury convicted White on both counts of first degree murder. White again appealed contending that the principles of collateral estoppel and res judicata prohibited his prosecution in the second trial as the actual killer. He argued that the trial

court committed error in denying his motion to prohibit the prosecution from proceeding on the theory that he fired the fatal shots.

Division Five of this court agreed with White's position and, in analyzing the problem, stated: "The doctrine of collateral estoppel prevents the relitigation of issues decided between the parties in earlier proceedings upon which a judgment on the merits of the issues has become final. [Citations.] In the instant case, the issue of appellant's use of a gun in the commission of these particular homicides was litigated between the parties and decided finally in appellant's favor in the first trial. In the second trial the prosecution sought to relitigate the same issue. It argued that appellant was guilty of murder if he was 'the actual perpetrator, that it was Mr. Willie White out there who pulled the trigger on one of the firearms or both of them that killed these people.' Appellant's use of a gun was resolved adversely against the prosecution in the first trial, and should not have been relitigated in the second. The prosecution is not prevented from proceeding on the theory that appellant supplied the weapons or otherwise participated as a principal. (See Pen. Code, § 31.) What it cannot do is relitigate the fact of appellant's *use* of a gun in these homicides, since that issue was decided against it in the first trial. Principles of double jeopardy and due process which incorporate the doctrine of collateral estoppel preclude such action." (*People* v. *White, supra,* 185 Cal.App.3d at pp. 827-828.)

■ As acknowledged in *White,* ". . . the doctrine [of res judicata] applies to criminal as well as civil proceedings. . . . [*Sealfon* v. *United States* (1948) 332 U.S. 575, 578 [92 L.Ed. 180, 68 S.Ct. 237]] . . . [and] collateral estoppel [is] not only a requirement of due process, but included within the 'Fifth Amendment's guarantee against double jeopardy.' [*Ashe* v. *Swenson* (1970) 397 U.S. 436, 443-445.]" (*People* v. *White, supra,* 185 Cal.App.3d at pp. 826-827.)

■ As explained in *Ashe* v. *Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469, 90 S.A. 1189], " 'collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Id.* at p. 443 [25 L.Ed.2d at p. 475].)

"Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a

party or in privity with a party at the prior [proceeding].'" (*People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321], quoting *People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622].)

■ The purposes justifying application of the doctrine of collateral estoppel have been defined as: (1) promoting judicial economy by minimizing repetitive litigation; (2) preventing inconsistent judgments which undermine the integrity of the judicial system; and (3) providing repose by preventing a person from being harassed by vexatious litigation. (*People* v. *Taylor, supra,* 12 Cal.3d at p. 695.) *Taylor,* citing *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co. Ltd.* (1962) 58 Cal.2d 601, 605 [25 Cal.Rptr. 559, 375 P.2d 439], also observed: "In deciding whether the doctrine is applicable in a particular situation a court must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case." (*Id.* at p. 695.)

In reaching its conclusion that collateral estoppel precluded retrial of the defendant as the perpetrator, the *White* court placed considerable reliance on *People* v. *Asbury* (1985) 173 Cal.App.3d 362 [218 Cal.Rptr. 902], a case which utilized the doctrine of "collateral estoppel" to bar the retrial of a defendant on a felony murder theory. We believe *White*'s reliance on Asbury was misplaced, although understandably so. In our judgment the proper rationale for the conclusion reached in *Asbury* was the principle of double jeopardy and not collateral estoppel. A discussion of *Asbury* is required.

Asbury's original trial resulted in his conviction of first degree murder and robbery. At the same time the jury rejected a special circumstance allegation that the murder occurred during the course of the robbery. (Pen. Code, § 190.2, subd. (a)(17).) The jury also concluded that although the defendant had used a deadly weapon during the murder (Pen. Code, § 12022, subd. (b)) he had not done so during the robbery nor had he inflicted great bodily injury during the robbery (Pen. Code, § 12022.7). Asbury appealed and his conviction was reversed for reasons relating to his self-representation at trial.

Asbury was retried. During the second trial the court refused to instruct the jury on premeditated murder, determining there was insufficient foundation for the instruction. The case was submitted to the jury on felony murder pursuant to Penal Code section 189.[1] Asbury was again convicted of first degree murder and robbery.

---

[1] Penal Code section 189 provides, inter alia: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate and

The *Asbury* court, in reversing the conviction observed: "[In] finding the defendant guilty of first degree murder . . . the jury necessarily . . . determined that the murder had occurred during the course of the robbery—a finding in apparent conflict with the verdict in the earlier proceeding rejecting the robbery special circumstance allegation and the allegations of deadly weapon use and infliction of great bodily injury during the robbery." (*People* v. *Asbury, supra,* 173 Cal.App.3d at p. 365.) The court held that because the jury had ". . . necessarily rejected the notion that the murder occurred during the course of the robbery" (*ibid.*) the doctrine of collateral estoppel barred the felony murder conviction at the second trial.

The *Asbury* holding was predicated on the "virtually indistinguishable" language of Penal Code section 190.2, subdivision (a)(17) and Penal Code section 189. The former statute defines the special circumstances as specifying that the murder occur "in the commission of" robbery, while the latter statute defines felony murder as murder "in the perpetration of" robbery. (*People* v. *Asbury, supra,* 173 Cal.App.3d at p. 365.) "In light of the plain meaning of these statutes" (*Ibid.*) the court accepted Asbury's contention that "collateral estoppel" barred the felony murder conviction.

As previously indicated, in our judgment the principle of double jeopardy controlled the issue before the *Asbury* court, not collateral estoppel. When the first *Asbury* jury decided that the murder had not occurred in the commission of the robbery, that finding *impliedly acquitted Asbury of the offense of first degree murder, which, as defined in Penal Code section 189, includes murder in the perpetration of a robbery.* Using the language of Penal Code section 1023, the jeopardy statute not referred to in the *Asbury* opinion, felony murder was an offense "of which [*Asbury*] might have been convicted under the accusatory pleading" at the first trial.[2]

Our dissenting colleague argues that "the theory of implied acquittal . . . is correctly applied only in relation to a charged or necessarily included offense" and, therefore, "has no application . . . in *Asbury* . . . ." (Dis. opn., *post*, p. 1335.) The argument is premised on Justice Kline's statement, ". . . felony murder is not an offense 'necessarily included' within the

---

premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under section 288, is murder of the first degree; and all other kinds of murders are of the second degree. . . ."

[2] Asbury was originally charged with murder pursuant to Penal Code section 187. Our Supreme Court has recognized that the "usual manner" of charging the crime of murder is "without specification of degree." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 379 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) Penal Code section 187, subdivision (a), defines murder as the "unlawful killing of a human being, or a fetus, with malice aforethought." The degrees of murder are defined in Penal Code section 189. A murder charge pursuant to section 187 may include first and second degree murder.

offense of first degree murder, . . . .' (Dis. opn., *post*, p. 1333.) While we certainly agree with the general proposition that not every first degree murder necessarily includes a felony murder as defined in Penal Code section 189 (the *White* and instant cases for example), the patently evident fact of the matter is that felony murder was necessarily included in the first *Asbury* trial. There, the special circumstance allegation requiring that the murder occur "in the commission of" robbery, language which, we repeat, the *Asbury* court found "virtually indistinguishable" from the felony murder definition of murder "in the perpetration of" robbery, provided an element that elevated the crime from second degree murder to first degree murder. Asbury could not have murdered in the commission of robbery without, at the same time, subjecting himself to a first degree murder conviction under the felony murder rule.

 It is fundamental that double jeopardy will not bar retrial of a defendant who has succeeded in overturning his conviction. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 719-720 [23 L.Ed.2d 656, 665-666, 89 S.Ct. 2072].) This rule rests on the premise that the original conviction is nullified and "the slate wiped clean." (*Id.* at p. 721 [23 L.Ed.2d at p. 667]; see *Bullington v. Missouri* (1980) 451 U.S. 430, 442 [68 L.Ed.2d 270, 281, 101 S.Ct. 1852].)

A well-established exception to the general rule enunciated in *North Carolina v. Pearce* lies where a defendant has been *impliedly acquitted of an offense* at the first trial. In *Gomez v. Superior Court* (1958) 50 Cal.2d 640, 652 [328 P.2d 976], our Supreme Court observed: "Double jeopardy attaches when [defendants] are threatened with a second trial on the charge of grand theft of which they were impliedly acquitted at the first trial where they were found guilty only of petty theft." In *People v. Mercer* (1962) 210 Cal.App.2d 153, 161 [26 Cal.Rptr. 502], the court stated: ". . . the jury returned its verdict, finding appellant guilty of second degree murder, thus impliedly finding that the killing did not take place during the perpetration of a robbery by the appellant of the decedent. The result of this implied finding was to acquit the appellant of the charge of first degree murder, thus precluding any subsequent trial of appellant on such charge." *Gomez* and *Mercer* follow the lead of *Green v. United States* (1957) 355 U.S. 184 [2 L.Ed.2d 199, 204, 78 S.Ct. 221, 61 A.L.R.2d 1119]. In *Green,* the defendant was indicted for first degree murder. At trial the jury was instructed that it could convict on either first or second degree murder. The jury convicted on second degree, but the conviction was reversed on appeal. The United States Supreme Court held " '. . . that a retrial on the first degree murder charge was barred by the Double Jeopardy Clause, because the defendant was forced to run the gantlet once on that charge and the jury refused to convict

him.' (*Id.* at p. 190; see also *Price* v. *Georgia,* 398 U.S. 323 (1970).)" (*Bullington* v. *Missouri, supra,* at p. 443 [68 L.Ed.2d at p. 281].)

The issue before the *Asbury* court is decidedly different from that which confronted the *White* court or which faces this court. In *Asbury,* the first degree felony murder offense was decided adversely to the People at the first trial, resulting in an implied acquittal of that charge of which he might have been convicted under the accusatory pleading. This implied acquittal and the resulting attachment of jeopardy gave finality on the merits to the felony murder offense. In contrast, White, and Pettaway here, both convicted of first degree murder at the first trial, were not beneficiaries of a jury determination that impliedly acquitted them of the offense of first degree murder. There was no finality on the merits as to the offense charged.

The court in *People* v. *White,* we respectfully submit, merely adopted the erroneous "collateral estoppel" label offered by *Asbury* without an appreciation that finality on the merits had been realized in *Asbury* by the attachment of jeopardy due to an implied acquittal of the felony murder offense.

As we pointed out earlier, a prerequisite to barring litigation of an issue by collateral estoppel is that ". . . "(2) the previous (proceeding) resulted in a final judgment on the merits. . . ." (*People* v. *Sims, supra,* 32 Cal.3d 484.) The Ninth Circuit in *Newton* v. *Superior Court of California* (9th Cir. 1986) 803 F.2d 1051, 1057, quoting an earlier decision of that court (*United States* v. *Hernandez* (9th Cir. 1978) 572 F.2d 218), describes the collateral estoppel doctrine in this manner: " 'When an issue of fact or law is actually litigated and determined by a final and valid judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim. [Citation.]' " The *Newton* court, citing *Ashe* v. *Swenson, supra,* 397 U.S. 444, observes that inquiry into application of the doctrine " 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' "

■ Contrary to the holding in *People* v. *White* we conclude that a negative finding on the enhancements was not essential to the judgment of conviction of first degree murder reached at the first trial, does not impose any finality on the merits and, therefore, does not collaterally estop the prosecution from retrying the appellant as the perpetrator nor preclude the presentation of admissible evidence to prove that theory of guilt.

Several California cases clearly demonstrate the adjunctive nature of an enhancement. Our Supreme Court in *In re Culbreth* (1976) 17 Cal.3d 330, 333 [130 Cal.Rptr. 719, 551 P.2d 23], held that a firearm-use enhancement

under Penal Code section 12022.5 ". . . does not prescribe a new offense but merely additional punishment for an offense in which a firearm is used. [Citation.] [¶] The legislative purpose of section 12022.5 has been described as deterrence, i.e., to deter the use of firearms on subsequent occasions." (See also *People* v. *Henry* (1970) 14 Cal.App.3d 89, 92 [91 Cal.Rptr. 841].)

Again acknowledging that " 'section 12022.5 does not prescribe a new offense but merely additional punishment for an offense in which a firearm is used,' " our Supreme Court, adhering to the view adopted by a majority of Court of Appeal decisions, held that " 'an allegation of firearm use for purposes of Penal Code section 12022.5 is not to be considered in determining whether the accusation encompasses a lesser included offense.' " (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 100-101 [192 Cal.Rptr. 748, 665 P.2d 520].) The court reasoned that to allow a use enhancement to be considered a part of the accusatory pleading for the purpose of defining lesser included offenses raised due process objections. It explained: ". . . an offense not necessarily included as a matter of law may become such because of the 'specific language of the accusatory pleading.' [Citation.] That rule rests on principles of due process—that a defendant cannot be convicted of a charge unless he has received notice from the accusatory pleading that he may be called upon to defend against the charge. [Citation.] The application of those principles to an enhancement allegation, however, is unclear *since that allegation becomes relevant only if the defendant is convicted of a substantive crime.*" (Italics added.) (*Id.* at p. 101.)

The question of whether a jury's finding that defendant did not personally use a firearm would collaterally estop his conviction of murder was explored in *People* v. *Nunez* (1986) 183 Cal.App.3d 214 [228 Cal.Rptr. 64]. In *Nunez* the defendant was convicted of conspiracy to commit murder and first degree murder. The jury found a firearm-use allegation not true. In separate trials for the same crimes the alleged coconspirators were acquitted of the murder and conspiracy charges though found guilty of lesser offenses. On appeal defendant Nunez contended, inter alia, that the prosecution should have been barred from relitigating the issues of malice and defendant's motive of killing for financial gain. He argued that "since the jury found he did not personally use a firearm . . . he was not found to be the direct perpetrator of the murder." Further, that since it had been determined (in the separate trial) that an alleged coconspirator (Medina) entertained no malice, the defendant therefore entertained no malice. (*Id.* at p. 225.)

The appellate court rejected this contention pointing out that it was based on the speculative assumption that the jury necessarily found Nunez an aider and abettor and not a direct perpetrator. The court held that "[a]

jury's finding on an alleged enhancement that an accused was not armed with a firearm or did not personally use a firearm does not necessarily mean that the accused was not a direct perpetrator of the crime." (*People* v. *Nunez, supra,* 183 Cal.App.3d at pp. 225-226.)

The *Nunez* court followed similar reasoning in *People* v. *Lopez* (1982) 131 Cal.App.3d 565 [182 Cal.Rptr. 563] where the defendant claimed that " 'the negative finding on the enhancement allegation is equivalent to a special verdict on the factual question of whether [he] personally used a firearm.' " (*People* v. *Nunez, supra,* 183 Cal.App.3d at p. 226.) For convenience we will quote verbatim the *Nunez* court's reference to the *Lopez* decision:

"In *People* v. *Lopez* (1982) 131 Cal.App.3d 565, Lopez and three other men were charged with assault with a deadly weapon and personally using a firearm pursuant to section 12022.5. The charges stemmed from an incident in which the defendant and the other men were responsible for shooting a rifle at a group of people in the park. The majority of the evidence indicated that Lopez fired the rifle. Lopez ultimately was convicted of six counts of assault with a deadly weapon, but the jury found he did not personally use a firearm in committing the offense.

"Lopez argued the evidence was insufficient to support findings that he aided and abetted an assault with a deadly weapon. He contended the court could not analyze the evidence for sufficiency under the theory that he was the direct perpetrator because the jury found he did not personally use a firearm. As the appellate court phrased Lopez's argument, 'he claims the negative finding on the enhancement allegation is equivalent to a special verdict on the factual question of whether he personally used a firearm.' (*People* v. *Lopez, supra,* 131 Cal.App.3d at p. 569.)

"The *Lopez* court determined, however, it was not bound by Lopez's theory in examining the sufficiency of the evidence. The court first noted that a jury may make inconsistent findings or verdicts as to a defendant charged with two offenses. An acquittal on one offense will not invalidate a verdict on a second offense, although the two verdicts are factually inconsistent. (*People* v. *Lopez, supra,* 131 Cal.App.3d at p. 570.) This rule is based on the realization that inconsistent findings may be caused simply by the mercy or leniency of the jury. (*Id.* at p. 571.) The *Lopez* court found that this rule also should be applicable when the inconsistency exists between a verdict on an offense and a finding on an enhancement. It finally held the evidence was sufficient to support a jury verdict that defendant had fired a rifle at a group of people and was guilty of assault with a deadly weapon. (*Id.* at pp. 570-572; see also *People* v. *Federico* (1981) 127 Cal.App.3d 20,

31-33 [179 Cal.Rptr. 315].)" (*People* v. *Nunez, supra,* 183 Cal.App.3d at p. 226.)

We agree with the conclusion reached by the *Nunez* and *Lopez* courts that a negative finding on a personal-use enhancement does not necessarily mean the accused was not a direct perpetrator of the crime. As pointed out in those cases, "inconsistent findings may be caused simply by the mercy or leniency of the jury" (*People* v. *Nunez, supra,* 183 Cal.App.3d at p. 226), to which we might add, or through confusion or ennui.

■ It has been said that "[c]ollateral estoppel is an equitable concept based on fundamental principles of fairness. For issue preclusion purposes it means that a party ordinarily may not relitigate an issue that was fully and fairly litigated on a previous occasion." (*Sandoval* v. *Superior Court* (1983) 140 Cal.App.3d 932, 941 [190 Cal.Rptr. 29], cited in *People* v. *Nunez, supra,* 183 Cal.App.3d at p. 222.) Furthermore, "[c]ollateral estoppel is only applicable where the issue necessarily decided at the previous trial is identical to the one sought to be relitigated." (*People* v. *Taylor, supra,* 12 Cal.3d at p. 691, cited in *People* v. *Nunez, supra,* 183 Cal.App.3d at p. 222.)

■ Here, the issue which the People seek to relitigate is whether the defendant is guilty of murder and, if so, to what degree. We are not concerned with the subject of punishment following conviction. A use enhancement is relevant only to punishment. It is not an element of the substantive offense charged. When, as here, the defendant's earlier conviction of murder is reversed on appeal and the defendant is subject to retrial, a finding on an enhancement allegation by the first jury is superfluous to a determination of the guilt or innocence of the charged offense at the second trial.

Nor can it be said that the guilt issue was "fully" litigated at the first trial. There, the People were denied the testimony of Lowana Walker due to her invocation of the Fifth Amendment privilege. That testimony was, and is, significantly relevant to defendant's role in the homicide. The People's offer of proof demonstrated that evidentiary impediment would not be present on retrial.

The court in *People* v. *Nunez, supra,* 183 Cal.App.3d at page 223, referred to the observations of the United States Supreme Court on the subject of " 'full and fair opportunity to litigate' " in *Standefer* v. *United States* (1980) 447 U.S. 10 [64 L.Ed.2d 689, 100 S.Ct. 1999]. While we acknowledge that the subject was discussed in the context of whether collateral estoppel barred the government from prosecuting the defendant as an aider and abettor when the alleged perpetrator had been acquitted of the underlying

offense, we nevertheless find the discussion germane to the problem before us and quote, in part, from the *Nunez* analysis of *Standefer*.

". . . The court first noted that the government in a criminal case, unlike a party in a civil case, is often without the kind of 'full and fair opportunity to litigate' upon which collateral estoppel is based. . . . [¶] The *Standefer* court also reasoned that the rules of evidence could preclude the prosecution from presenting all the evidence it had in a particular case against a particular defendant. . . . The [*Standefer*] court stated, 'In such circumstances, where evidentiary rules prevent the Government from presenting all its proof in the first case, application of nonmutual estoppel would be plainly unwarranted.' (*Standefer* v. *United States, supra,* 447 U.S. at p. 24.)" (183 Cal.App.3d at pp. 223-224.)

None of the purposes justifying the application of collateral estoppel, as they have been defined by our Supreme Court in *People* v. *Taylor, supra,* 12 Cal.3d 686, find relevance in the case before us. Certainly, we cannot rely on a desire to promote judicial economy to justify collaterally estopping the retrial of defendant as a perpetrator when there is significant evidence pointing to his culpability in that regard. Certainly, there is no undermining of the integrity of the judicial system by inconsistent judgments when the only judgment in the case declared defendant guilty of first degree murder. More likely, the integrity of the system would be undermined by permitting enhancement findings, made irrelevant by reversal, to control the theory and evidence of the case on retrial. And certainly, it cannot be said that defendant is being subjected to harassment by vexatious litigation when he was subject to retrial for murder as an aider and abettor in any event.

As we noted earlier, "collateral estoppel is an equitable concept based on fundamental principles of fairness." Here, the People insist that the evidence points to the defendant as perpetrator, not aider and abettor, and decline to try the case solely on the latter theory. Based upon the offer of proof made to the trial judge at the motion hearing, their position does not appear unreasonable. If on retrial the prosecution were limited to trying the defendant as an aider and abettor, and a jury were to determine that Lowana did not personally shoot Karen Taylor, then defendant could be acquitted despite the existence of admissible evidence that he perpetrated the homicide. This flies in the face of fairness and good sense, particularly when a jury has already found sufficient evidence to convict the defendant of murder. The principles of fairness apply to all parties in the litigation. If the defendant were to enjoy an acquittal, then let it be on the merits following a fair presentation of admissible evidence and not because of an artificial curtailment of the People's theory and proof predicated upon a punishment finding which became irrelevant when the conviction was reversed.

Our dissenting colleague accuses us of "complete indifference to the double jeopardy clause of the Fifth Amendment." The rhetoric is unfortunate for it carries the implication that we are somehow involved with a double jeopardy issue in our consideration of whether defendant may be retried as a perpetrator. That is simply not the case. The defendant here is subject to "continuing jeopardy." The United States Supreme Court explains the concept of continuing jeopardy in *Justices of Boston Municipal Court* v. *Lydon* (1984) 466 U.S. 294, 308 [80 L.Ed.2d 311, 324-325, 104 S.Ct. 1805]:

■■■ "The Double Jeopardy Clause is not an absolute bar to successive trials. The general rule is that the Clause does not bar reprosecution of a defendant whose conviction is overturned on appeal. *United States* v. *Ball, supra.* The justification for this rule was explained in *United States* v. *Tateo,* 377 U.S. 463, 466 (1964), as follows: [¶] 'While different theories have been advanced to support the permissibility of retrial, of greater importance than the conceptual abstractions employed to explain the *Ball* principle are the implications of that principle for the sound administration of justice. Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.'

"In *Price* v. *Georgia,* 398 U.S. 323, 329 (1970), we recognized that implicit in the *Ball* rule permitting retrial after reversal of a conviction is the concept of 'continuing jeopardy.' See also *Breed* v. *Jones,* 421 U.S. 519, 534 (1975). That principle 'has application where criminal proceedings against an accused have not run their full course.' 398 U.S. at 326. Interests supporting the continuing jeopardy principle involve fairness to society, lack of finality, and limited waiver. *Id.,* at 329, n. 4. . . ."

Succinctly stated, ". . . the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy. [Citation.]" (*Richardson* v. *United States* (1984) 468 U.S. 317, 325 [82 L.Ed.2d 242, 251, 104 S.Ct. 3081].) Here, that event has not occurred and the original jeopardy continues.

■■■ Where neither double jeopardy nor the principle of collateral estoppel is applicable in preventing reprosecution, as is the case here, the parties are placed in the "same position as if the cause had never been tried." (*People* v. *Murphy* (1963) 59 Cal.2d 818, 833 [31 Cal.Rptr. 306, 382 P.2d 346], citing to *Hall* v. *Superior Court* (1955) 45 Cal.2d 377, 381 [289 P.2d 431].) The effect of a reversal of a judgment is discussed in *Odlum* v. *Duffy* (1950) 35 Cal.2d 562, 564-565 [219 P.2d 785]: "It is well settled that

the reversal of a judgment or order ordinarily leaves the proceeding in the same situation in which it stood before the judgment or order was made. [Citations.] The same rule has been stated with respect to the reversal of orders in criminal cases. [Citation.] It therefore appears that upon the reversal of the trial court's order refusing to vacate the judgment of conviction, the parties were restored to the position that they had before the reversed order was made and with the same rights that they originally had, 'with the exception that the opinion of the court of appeal must be followed so far as applicable.'"

We must also take issue with our dissenting colleague's apparent reliance on *Arizona* v. *Rumsey* (1984) 467 U.S. 203 [81 L.Ed.2d 164, 104 S.Ct. 2305] and *Bullington* v. *Missouri, supra,* 451 U.S. 430, to justify the result reached in *Asbury* and *White* and which he would impose in the present case. (Dis. opn., *post*, at pp. 1341-1342.) In *Rumsey* and *Bullington* the Supreme Court did accord double jeopardy protection to special verdicts rendered by fact finders refusing to impose the death penalty. However, in both cases jeopardy was considered in light of detailed statutory procedures set in motion *after determination of guilt* and requiring a "precisely defined," separate presentence hearing on the issue of death or life imprisonment.[3]

What our dissenting colleague ignores in his discussion of *Rumsey* and *Bullington* is the acknowledged reluctance of the Supreme Court to extend the double jeopardy principle to sentencing and the very limited rationale which supports the holding.

In *Bullington* the Supreme Court opened its discussion of the issue with the following comments: "It is well established that the Double Jeopardy Clause forbids the retrial of a defendant who has been *acquitted* of the crime charged. *United States* v. *DiFrancesco,* 449 U.S. 117, 129-130 (1980); *Burks* v. *United States,* 437 U.S. 1, 16 (1978); *United States* v. *Martin Linen Supply Co.,* 430 U.S. 564, 571 (1977); *Fong Foo* v. *United States,* 369 U.S. 141, 143 (1962); *Green* v. *United States,* 355 U.S. 184 (1957). This Court, however, has resisted attempts to extend that principle to sentencing. The imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed. The Court generally has concluded, therefore, that the Double Jeopardy Clause im-

---

[3] Footnote 10 in *Bullington* notes: "At the statutorily prescribed presentence hearing, counsel make opening statements, testimony is taken, evidence is introduced, the jury is instructed, and final arguments are made. The jury deliberates and returns its formal punishment. . . ." (451 U.S. at pp. 438-439 [68 L.Ed.2d at p. 279].) In *Rumsey* the court, after outlining the procedure set forth in the Arizona statute commented: ". . . these characteristics make the Arizona capital sentencing proceeding indistinguishable for double jeopardy purposes from the capital sentencing proceeding in Missouri." (467 U.S. at p. 210 [81 L.Ed.2d at p. 171].)

poses no absolute prohibition against the imposition of a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside. See *North Carolina* v. *Pearce,* 395 U.S. 711 (1969). See also *United States* v. *DiFrancesco,* 449 U.S., at 133, 137-138; *Chaffin* v. *Stynchcombe,* 412 U.S. 17, 23-24 (1973); *Stroud* v. *United States,* 251 U.S. 15 (1919)." (*Bullington* v. *Missouri, supra,* at pp. 437-438 [68 L.Ed.2d at p. 278].).

The court continued: "The procedure that resulted in the imposition of the sentence of life imprisonment upon petitioner Bullington at his first trial, however, differs significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing. . . . The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes." (451 U.S. at p. 438 [68 L.Ed.2d at pp. 278-279].)

The narrowly crafted holding in *Bullington* concludes: "Because the sentencing proceeding at petitioner's first trial was like the trial on the question of guilt or innocence, the protection afforded by the Double Jeopardy Clause to one acquitted by a jury also is available to him, with respect to the death penalty, at his retrial. We therefore refrain from extending the reasoning of *Stroud* v. *United States,* 251 U.S. 15 (1919), to this very different situation." (451 U.S. at p. 446 [68 L.Ed.2d at p. 284], fn. omitted.)

Clearly, *Bullington* and *Rumsey* are inapposite to *White* and the case before us. They involve cases where the defendants were *convicted of the crime charged* and the states' procedures required a second trial on the issue of punishment. However, our colleague's discussion of *Bullington* and *Rumsey* does serve to highlight the analytical error which permeates his dissent. He chooses to put the *Asbury, White* and Pettaway cases on the same plane, consistently ignoring that White and Pettaway were convicted of the first degree murder offense, while Asbury on the other hand, was impliedly acquitted of first degree felony murder. Thus while jeopardy had attached to Asbury, its protection did not flow to White or Pettaway.

There is another aspect of *People* v. *White, supra,* 185 Cal.App.3d 822, which requires discussion. In *White,* the respondent contended Penal Code section 954[4] permitted retrial of the gun use issue. Our colleagues in Division Five dismissed the argument on two grounds: "a statutory enactment cannot override the constitutional prohibition against double jeopardy" and

---

[4] The relevant portion of section 954 provides: "An acquittal on one or more counts shall not be deemed an acquittal of any other count."

"section 954 is concerned with multicount indictments or informations, and not with the retrial of issues previously adjudicated to finality." (185 Cal.App.3d at p. 828.) The *White* court then explained that inconsistencies in unified jury verdicts are tolerated. To allow the prosecution to retry the case on the theory White used a firearm " 'implicates concerns about the injustice of exposing a defendant to repeated risks of conviction for the same conduct . . . that lie at the heart of the double jeopardy clause.' " The court went on to say "the previous jury decided that issue and *acquitted* him of that *charge.*" (*Id.* at p. 829, italics added.) The *White* court, we respectfully submit, was wrong in the application of section 954 and mischaracterized what the first jury did.

Both Pettaway and White were found by their first juries to be guilty of murder; both juries also found untrue the allegation of use of a firearm in connection with the murder. In *People* v. *Amick* (1942) 20 Cal.2d 247 [125 P.2d 25], appellant was charged in count one with manslaughter and in count two with negligent homicide. Both counts grew out of the same act by appellant. The jury found appellant guilty of negligent homicide and not guilty of manslaughter. Appellant claimed the verdicts were inconsistent and conflicting since the same evidence was relied on in both counts and the verdicts were insufficient to support the conviction. The Supreme Court held that the 1927 amendment to Penal Code section 954 permitted inconsistent verdicts and the disposition of one count had no bearing on the verdict with respect to other counts; each count must stand on its own merits.

In *People* v. *Federico, supra,* 127 Cal.App.3d 20, a jury determined appellant guilty of murder but also found untrue the enhancements that he was armed with a firearm and used a firearm. Appellant argued that reversal of the murder conviction was mandated because of a fatal inconsistency between the verdict of guilty on the murder count and the jury's finding that the allegation that appellant was armed with a firearm in the commission of the murder was not true. The *Federico* court rejected this contention relying on Penal Code section 954 and the rule that each count must stand on its own merits. The court recognized a limited exception to the rule that each count must stand on its own merits. The exception comes into play where " 'all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, *and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty.*' " (*Id.* at p. 32, italics in original.) While acknowledging that ". . . strictly speaking the allegation that defendant was armed in the commission of the murder did not charge a separate offense" the court held that ". . . the principles found in Penal Code section 954 and the cases interpreting it are applicable in resolving the logical inconsistency

between the not true findings of the armed allegation and the guilty verdict on the murder charge." (*Id.* at pp. 32-33; see also *People* v. *Brown* (1985) 174 Cal.App.3d 762, 768 [220 Cal.Rptr. 264].)

Had Pettaway contended in his appeal that his conviction for murder must be reversed on the grounds it was inconsistent with the finding on the enhancement, he could not have prevailed under Penal Code section 954 and the above cited cases. There is no logical reason why the result should differ on retrial after his murder conviction was reversed for *Beeman* error. The finding on the enhancement simply has no effect on the murder charge in the first or the second trial.

■ Finally, we briefly address whether under double jeopardy principles defendant here may be retried on the enhancement allegations which the jury determined in his favor. Earlier we noted that the People had conceded defendant's immunity from retrial on the enhancement issues. Subsequent to our submission of this matter we requested additional briefing addressed to the propriety of this concession. We are now satisfied that the People's concession was sound and that retrial on an enhancement allegation is precluded where a jury has resolved that question, correctly or not, in defendant's favor.

The California Supreme Court addressed the issue in *People* v. *Henderson* (1963) 60 Cal.2d 482, 495-497 [35 Cal.Rptr. 77, 386 P.2d 677]. Justice Traynor, writing for the majority, stated: "Defendant contends that the prohibition against double jeopardy precludes imposing the death sentence after reversal of the first judgment sentencing him to life imprisonment. Article I, section 13, of the California Constitution provides that 'No person shall be twice put in jeopardy for the same offense. . . .' It states a fundamental principle limiting the state's right repeatedly to prosecute a defendant. It is not an absolute prohibition, for although jeopardy may have attached, legal necessity or the real or implied consent of the defendant permits a retrial. [Citation.] In the present case, we must determine the extent to which a defendant who attacks an erroneous conviction thereby opens the door to being again placed in jeopardy. [¶] He does not gain immunity, for by successfully attacking the judgment he at least subjects himself to a retrial that may reach the same result. [Citations.] There is a sharp conflict in the cases, however, whether such an attack opens the door to the imposition of a more severe sentence on retrial. . . ."

Concluding that the double jeopardy principle of the state Constitution forbids the imposition of a greater punishment for the same crime on retrial, Justice Traynor concluded: "A defendant's right of appeal from an erroneous judgment is unreasonably impaired when he is required to risk his life to

invoke that right. Since the state has no interest in preserving erroneous judgments, it has no interest in foreclosing appeals therefrom by imposing unreasonable conditions on the right to appeal." (*People* v. *Henderson, supra,* 60 Cal.2d at p. 497.)

More recently our Supreme Court in *People* v. *Collins* (1978) 21 Cal.3d 208, 216 [145 Cal.Rptr. 686, 577 P.2d 1026], addressing a sentencing issue observed: "We find precedent for the foregoing result in a line of cases based on principles of double jeopardy. Our concern there was specifically to preclude vindictiveness and more generally to avoid penalizing a defendant for pursuing a successful appeal. In *People* v. *Ali* (1967) 66 Cal.2d 277, 281 [57 Cal.Rptr. 348, 424 P.2d 932], we stated that 'a defendant should not be required to risk being given greater punishment on a retrial for the privilege of exercising his right to appeal.'"

For the reasons expressed in *Henderson* and *Collins,* we agree that defendant cannot be retried on the Penal Code sections 12022.5 and 12022.7 enhancements.

The judgment of dismissal is reversed. The case is remanded for trial in accordance with the views expressed herein.

Rouse, J.,* concurred.

**KLINE, P. J.,** Concurring and Dissenting—I concur in the majority's conclusion that defendant may not be retried on the enhancement allegations that the jury decided in his favor. I dissent from the rest of the opinion, which, with complete indifference to the double jeopardy clause of the Fifth Amendment, concludes that defendant may be retried as the actual perpetrator in the killing of Karen Taylor despite a not true finding on the gun-use allegation at his first trial.

The jury's determination that defendant was not the trigger man seems as inexplicable to me as it does to my colleagues. The perceived incorrectness of a jury verdict in favor of a criminal defendant does not, however, create a license for appellate courts to right the wrong at all costs. The theory my colleagues contrive to avoid the consequences of the jury's explicit factual finding is not supported by the cases they rely upon, is analytically unsound and unjust and creates a constitutional problem that will prove far more troublesome than the questionable jury determination in this case.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

In *People* v. *White* (1986) 185 Cal.App.3d 822 [231 Cal.Rptr. 569] another division of this court unanimously held that an accused may not be retried as the actual perpetrator after a prior jury has indicated, by way of its not true findings on gun use allegations, that he did not fire the fatal shots.

The majority rejects *White* and reaches a contrary conclusion based on (1) its belief that the court in *White* failed to take into account relevant case law and improperly relied on *People* v. *Asbury* (1985) 173 Cal.App.3d 362 [218 Cal.Rptr. 902], which my colleagues think distinguishable; (2) the theory that the jury's rejection of the gun use allegation is not legally equivalent to a determination that the accused did not personally commit the homicide because it relates solely to sentencing; and (3) the claim that the procedural requirements for the invocation of collateral estoppel have not been met since the gun use finding was not "essential" to the first conviction and the prosecution was denied an opportunity to "fully and fairly" litigate the issue of defendant's gun use during the first trial. I will discuss each of these points in turn.

1.

In *White* the defendant appealed from a conviction of two counts of first degree murder. He maintained the trial court erred in permitting the prosecution to try the case on the theory that he personally shot the victims after the jury in a previous trial had determined he had not used a firearm in connection with the killings. The court agreed and reversed the judgment.

The majority strains to discredit *White* by questioning the relevance of *People* v. *Asbury, supra,* upon which *White* relies. In *Asbury* the jury at the first trial found the defendant guilty of first degree murder and robbery but rejected the special circumstance that the murder had occurred in the course of the robbery. The Court of Appeal held that the subsequent felony-murder conviction was barred by the doctrine of collateral estoppel—which is included within the Fifth Amendment's guaranty against double jeopardy (*Ashe* v. *Swenson* (1970) 397 U.S. 436, 443 [25 L.Ed.2d 469, 475, 90 S.Ct. 1189])—because "the original jury, in finding the special circumstance not true, necessarily rejected the notion that the murder occurred during the course of the robbery." (*People* v. *Asbury, supra,* 173 Cal.App.3d at p. 365.) The majority claims that *Asbury* is inapposite because, despite the court's clear statement to the contrary, the case did not genuinely raise an issue of collateral estoppel. According to the majority, the finding of the first *Asbury* jury that the murder had not occurred during the commission of the robbery "*impliedly acquitted Asbury* of the *offense of first degree murder . . . in the perpetration of a robbery.*" (Maj. opn., *ante,* p. 1320, original italics.)

Relying upon language in Penal Code section 1023, a statute never mentioned in the *Asbury* opinion, the majority concludes that "felony murder was an offense 'of which [Asbury] might have been convicted under the accusatory pleading' at the first trial." (*Ibid.*) My colleagues' rationale for the result in *Asbury* does not hold up to analysis.

As our Supreme Court has pointed out, Penal Code section 1023 relates to the doctrine of included offenses, which is a part of the constitutional guaranty against double jeopardy. (*People* v. *Kehoe* (1949) 33 Cal.2d 711, 713 [204 P.2d 321], cert. den. *Kehoe* v. *California* (1949) 338 U.S. 834 [94 L.Ed. 509, 70 S.Ct. 39].) The statute provides as follows: "When the defendant is convicted or acquitted or has been once placed in jeopardy upon an accusatory pleading, the conviction, acquittal or jeopardy is a bar to another prosecution for the offense charged in such accusatory pleading, or for an attempt to commit the same, or for an offense necessarily included therein, of which he might have been convicted under that accusatory pleading." This language does not apply to the situation that existed in *Asbury*.

First of all, felony murder is not an offense "necessarily included" within the offense of first degree murder; indeed, what the majority refers to as the "offense" of "first degree felony murder" (maj. opn., *ante*, p. 1321) does not exist; felony-murder is merely one of several definitions of murder in the first degree. (Pen. Code, § 189.) Ordinarily, a jury is not required to determine whether a defendant charged with first degree murder committed the offense in the course of committing any of the felonies enumerated in Penal Code section 189 *unless* the People prosecute the case on such a theory, in which case the jury receives CALJIC No. 8.21, which instructs that "[t]he unlawful killing of a human being . . . as a result of the commission of [a specified felony] . . . is murder of the first degree." Because a felony-murder theory was not originally advanced in *Asbury* this instruction was not given. The factual question whether the homicide was committed in the course of another felony was presented to the jury only because of the special circumstance allegation. If, contrary to the doctrine of included offenses set forth in Penal Code section 1023, conviction of first degree murder can result in an "implied acquittal" of that same offense on a prosecution theory which, though it was not actually advanced, can be shown to have been rejected by the jury due to a finding made in connection with a penalty enhancement, then the defendants in *White* and this case were also impliedly acquitted of first degree murder on the theory that they directly committed the act constituting the offense and were therefore perpetrators within the meaning of the Penal Code. (Pen. Code, § 31.) For purposes of the theory of implied acquittal conjured by the majority, the facts of *Asbury, White* and the present case are materially indistinguishable.

Moreover, if the majority's novel theory were accepted, the instant case would present an even stronger case than *Asbury* for implied acquittal. As indicated, the prosecution did not initially advance a felony-murder theory in *Asbury* and the jury addressed the factual question only because of allegations made in order to enhance penalty. In this case, on the other hand, the prosecution did advance an aiding and abetting theory that necessitated the giving of instructions (CALJIC Nos. 3.00 and 3.01) describing the difference between a perpetrator and an aider and abettor in connection with the charged homicide. Therefore, while the *Asbury* jury almost certainly did not understand the relationship between the facts set forth in the enhancement allegation and those relating to the murder charge (because it was never told about the felony-murder rule), the jury in this case almost certainly did understand that relationship, making it easier here to imply acquittal on the theory defendant directly committed the homicide than it was in *Asbury* to imply acquittal on a felony-murder theory. Looking at it from the point of view of the majority's distorted notion of the doctrine of included offenses, the prosecution's theory that the defendant in this case directly committed the homicide was much more clearly "included" in the charges against him than was felony-murder "included" in the charges against Asbury.

Though the majority's concept of included offenses and the collateral theory of implied acquittal, if consistently applied, would justify the result in this case that I think is constitutionally compelled, the majority's analysis is fundamentally flawed. The theory of implied acquittal embraced in Penal Code section 1023 is correctly applied only in relation to a charged or necessarily included offense; it therefore has no application either in *Asbury* or in this case.

*Asbury* was correctly decided for the reason stated in that opinion—collateral estoppel, not because of an implied acquittal. The situation in that case, like the situation in *White* and that here, satisfies all three requirements of collateral estoppel. The party against whom the estoppel was asserted was a party at the earlier trial, that proceeding resulted in a final judgment on the merits with respect to the ultimate fact in issue,[1] and, most

---

[1] Rejection of the special circumstances allegation in *Asbury,* like the findings of no gun use in *White* and the present case, could not have been appealed and therefore constituted a judgment which, for purposes of collateral estoppel, was both valid and final. As has authoritatively been stated, "[f]or purposes of issue preclusion . . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." (Rest.2d Judgments, § 13.) "To be 'final' for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment." (*Miller Brewing Co.* v. *Jos. Schlitz Brewing Co.* (7th Cir. 1979) 605 F.2d 990, 996, cert. den., 444 U.S. 1102 [62 L.Ed.2d 787, 100 S.Ct. 1067]; see *Lummus Company* v. *Commonwealth*

important for present purposes, the issue necessarily decided at the previous trial was identical to the one sought to be relitigated. The *Asbury* court found that when the first jury refused to find that the defendant committed the murder "in the commission of" the robbery (the phrase used in the special circumstance instruction), it was effectively declaring that he did not commit the murder "as a result of" the robbery (the language of the felony-murder instruction). The court was in effect saying that the finding of the jury at the previous trial was not simply an evidentiary determination but an "ultimate fact" (i.e., a finding involving the application of law to fact) with respect to both the special circumstances allegation and the question of felony murder. *Asbury* was thus a classic case for application of the rule of collateral estoppel because, as the Supreme Court has stated, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe* v. *Swenson, supra,* 397 U.S. 443 [25 L.Ed.2d at p. 475]; *People* v. *Taylor* (1974) 12 Cal.3d 686, 693 [117 Cal.Rptr. 70, 527 P.2d 622]; Rest.2d Judgments, § 27.)

Similarly, when the jury in the present case rejected the allegation that Pettaway "personally used a firearm during the commission of [the alleged homicide]" (the phrase used in the gun use instruction, CALJIC No. 17.19), it was effectively declaring that he did not "directly and actively commit the act constituting the crimes" (the language of CALJIC No. 3.00, given as part of the aiding and abetting instruction), thereby negating an ultimate fact necessary to convict him on the ground that he actually perpetrated the homicide. Jeopardy therefore attached in this case in precisely the same manner it did in *Asbury*. Just as Asbury might have been convicted on a felony-murder theory under the accusatory pleading at the first trial, so too at his first trial might Pettaway have been convicted of murder as a perpetrator, as the district attorney vigorously urged.

The special circumstances allegation in *Asbury,* like the gun-use allegation in *White* and in this case, was not included in the charges in order to establish an element of any offense, but simply to enhance the penalty. (Pen. Code, § 190.2.) The *Asbury* court recognized, however, that this was not crucial. With "realism and rationality," the court simply inquired "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration" (*Ashe* v. *Swenson, supra,* 397 U.S. 436, 444 [25 L.Ed.2d at pp. 475-476], fn. omitted) and found that it could not. This is what we should do, rather than employ "the hypertechnical and archaic approach of a 19th century pleading book." (*Ibid.* [25 L.Ed.2d at p. 475].)

*Oil Refining Company* (2d Cir. 1961) 297 F.2d 80, 89, cert. den., 368 U.S. 986 [7 L.Ed.2d 524, 82 S.Ct. 601].)

In a later part of its opinion the majority also takes issue with the *White* court's refusal to accept the argument that Penal Code section 954 (which, as pertinent, provides that "An acquittal on one or more counts shall not be deemed an acquittal of any other count") permitted retrial of the gun use issue. (Maj. opn., *ante*, p. 1329.) The majority's point is summed up in the following three sentences: "Had Pettaway contended in his [initial] appeal that his conviction for murder must be reversed on the grounds it was inconsistent with the finding on the enhancement, he could not have prevailed under section 954 and [*People* v. *Amick* (1942) 20 Cal.2d 247 [125 P.2d 25] and *People* v. *Federico* (1981) 127 Cal.App.3d 20 [179 Cal.Rptr. 315]]. There is no logical reason why the result should differ on retrial after his murder conviction was reversed for *Beeman* error. The finding on the enhancement simply has no effect on the murder charge in the first or the second trial." (Maj. opn., *ante*, p. 1330.)

This reasoning reveals the majority's failure to understand the difference between an inconsistent verdict at a single trial and multiple trials of the same person for the same offense. In *People* v. *Tideman* (1962) 57 Cal.2d 574 [21 Cal.Rptr. 207, 370 P.2d 1007], the Supreme Court described the statutory history of 954, stating that the legislative purpose of the language here relevant was to make it "altogether clear that under current criminal procedure . . . '[t]he doctrine of double jeopardy has no application [in a single criminal action] to a defendant who is tried but once on several counts. [Fn. omitted.]' " (*Id.,* at p. 581, quoting *People* v. *Chessman* (1951) 38 Cal.2d 166, 193 [238 P.2d 1001], cert den. *Chessman* v. *California* (1952) 343 U.S. 915 [96 L.Ed. 1330, 72 S.Ct. 650].) The reasons the law tolerates inconsistent verdicts, which were set forth in *White*,[2] are entirely unrelated

---

[2] The *White* opinion includes the following quote from *United States* v. *Mespoulede* (2d Cir. 1979) 597 F.2d 329, 336-337: " 'We tolerate inconsistencies in unified jury verdicts in criminal cases, not because of any singular virtue we attribute to inconsistency, but rather out of deference to the nature of the jury and the role it plays in our jurisprudence. There is no question but that a jury in a criminal trial has the power to render a verdict of acquittal that is wholly at odds with the law and the facts. As we pointed out in *United States* v. *Maybury*, 274 F.2d 899, 902 (2d Cir. 1960), this notion has its roots in the fact that the jury was originally conceived of as "inscrutable." Although we no longer believe that a jury's pronouncements must be accepted as unquestioningly as the results of an ordeal by cold water or an oath of compurgation, *see* T. Plunkett, *A Concise History of the Common Law* 115-16 (5th ed. 1956), an "arbitral" element of jury decision-making survives. We recognize that the jury is in a sense the conscience of the community and can, for example, render a verdict to mitigate an overly severe punishment. *United States* v. *Maybury, supra,* 274 F.2d at 902. Similarly, in compromising in order to reach a unanimous verdict, a jury is often fulfilling its role as a cross-section of the community that it is supposed to represent. Occasional anomalies are the price of unanimity. *Id.,* at 903. [¶] Internal inconsistency, then, is not an end in itself, and it would be irrational to expand gratuitously the judicial tolerance of inconsistent verdicts to permit different juries in successive trials to reach contradictory results. Allowing a second jury to reconsider the very issue upon which the defendant has prevailed serves no valuable function. To the contrary, it implicates concerns about the injustice of exposing a defendant

to the fundamentally different considerations that come into play when an accused person is subjected to more than one trial for the same offense.

My colleagues say they can think of no "logical reason" why the rationale of Penal Code section 954 should not apply where an individual is subjected to a second trial for the same offense. The "logical reason" they cannot fathom is the very principle that informs the prohibition against double jeopardy. "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." (*Green* v. *United States* (1957) 355 U.S. 184, 187-188 [2 L.Ed.2d 199, 204, 78 S.Ct. 221, 61 A.L.R.2d 1119].) This ancient idea, whose origins can be traced to Greek and Roman times and which became established in the common law of England long before our Nation declared its independence (*Benton* v. *Maryland* (1969) 395 U.S. 784, 795 [23 L.Ed.2d 707, 716, 89 S.Ct. 2056]), is too firmly rooted in our criminal jurisprudence to permit question. As Chief Justice Burger once observed, "where the Double Jeopardy Clause is applicable, its sweep is absolute. There are no 'equities' to be balanced, for the Clause has declared a constitutional policy, *based on grounds which are not open to judicial examination.*" (*Burks* v. *United States* (1978) 437 U.S. 1, 11, fn. 6 [57 L.Ed.2d 1, 9, 98 S.Ct. 2141], italics added.)

The *White* court was indubitably correct in concluding that the prohibition of double jeopardy cannot be compromised by application of Penal Code section 954 or its rationale.

Having cavalierly disposed of *White,* the majority relies on *People* v. *Lopez* (1982) 131 Cal.App.3d 565 [182 Cal.Rptr. 563] and *People* v. *Nunez* (1986) 183 Cal.App.3d 214 [228 Cal.Rptr. 64] (rev. den. Oct. 16, 1986) as support for its position. In *Lopez,* the defendant was found guilty on six counts of assault with a deadly weapon but the jury found he did not personally use a firearm. On appeal he claimed there was insufficient evidence to support the verdict and asserted that in light of the jury's finding on the use allegation the court was bound to assume he was convicted as an aider and abettor and not a principal. The court found the case analogous to those involving inconsistent verdicts[3] and rejected the defendant's argu-

to repeated risks of conviction for the same conduct, and to the ordeal of multiple trials, that lie at the heart of the double jeopardy clause.' (Fn. omitted.)" (*People* v. *White, supra,* 185 Cal.App.3d at pp. 828-829.)

[3] Penal Code section 954, which applies to this situation, provides that "An accusatory pleading may charge two or more different offenses connected together in their commission,

ment, finding that the inconsistency between the verdict on each of the offenses and the finding on the enhancement did not invalidate the convictions. *Lopez* is obviously different from the instant case, which does not involve rationally inconsistent verdicts or findings.[4] More importantly, since Lopez had been tried only once his case has nothing to do with the principles of collateral estoppel and double jeopardy that are directly implicated in this case, where defendant appears destined to face retrial for the same offense on a factual theory explicitly rejected by a prior jury.

My colleagues' reliance upon *Lopez* is curious, because the opinion in that case does not support but *repudiates* their principal assertion that a factual finding on an alleged enhancement is for double jeopardy purposes significantly different from a factual determination relating to an element of an offense. When it commenced its inquiry into the legal effect of the inconsistency between the verdict on each of the offenses and the finding that he did not use a firearm, the court in *Lopez* considered whether to ignore the finding of no use on the ground that, technically, an enhancement may be differentiated from an element of the offense—which is the course my colleagues take. The court refused to take this position because it realized that for the purposes of its legal analysis a negative factual finding regarding an enhancement cannot rationally be distinguished from a factual finding regarding an element of an offense. As stated in *Lopez,* "although the amended information alleges 'enhancement' rather than an 'offense' . . . , the degree of factual inconsistency is no greater, or no less, than in the cases discussed above [in which the inconsistency was solely between offenses]." (*Lopez, supra,* 131 Cal.App.3d at p. 570.)

The majority also relies on *People* v. *Nunez, supra,* 183 Cal.App.3d 214, where the defendant was convicted of conspiracy to commit murder for financial gain and first degree murder, although the jury found he did not personally use a firearm. Nunez maintained that since the jury had returned a not true finding on the gun-use allegation he had been convicted as an aider and abettor and, therefore, should benefit from the juries' conclusions in his coconspirators' cases that the killing was not committed with malice

---

or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count." The court concluded that pursuant to this language, a verdict is valid " 'even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' " (*Lopez, supra,* 131 Cal.App.3d at p. 570, quoting Witkin, Cal. Criminal Procedure, § 549, p. 560.)

[4] There is, of course, nothing illogical about finding appellant guilty of murder as an aider and abettor if, as must be presumed to have been the case, the jury was not convinced he used a gun during the crime.

for financial gain.[5] The court properly rejected these claims. First, it found that Nunez's motive for participating in the killing was not necessarily derived from his coconspirators and that he could be convicted of killing for financial gain despite the contrary finding at the trial of one of his coconspirators.

The court further reasoned that the verdict in the trial of Nunez's coconspirator, Medina, did not necessarily establish that Medina had been convicted as the perpetrator or that the jury had determined he had acted without malice. Because the record was insufficient to determine whether Medina had been tried solely as the perpetrator the court concluded that the requirements for applying collateral estoppel had not been met: "we cannot say the previous jury necessarily determined the only principal between the two men did not harbor malice. This issue not being decided adversely to the prosecution, collateral estoppel would not bar defendant's conviction of the crime of murder on the theory that he was either the direct perpetrator or guilty as an aider and abettor." (*Nunez, supra,* 183 Cal.App.3d at p. 227.) Thus, the court relied heavily on "the difficulty of identifying the issues resolved against the People in the prior trial." (*Id.,* at p. 221, relying on *People* v. *Taylor* (1974) 12 Cal.3d 686, 696 [117 Cal.Rptr. 70, 527 P.2d 622].) There is no such difficulty in the present case, where we know exactly what issue was resolved against the People at the first trial.

I have no quarrel with the reasoning in *Nunez.* However, in reaching its conclusion the court considered the effect of a negative finding on a gun-use allegation and made the bewildering statement—seized upon by the majority here—that "[a] jury's finding on an alleged enhancement that an accused was not armed with a firearm or did not personally use a firearm does not necessarily mean that the accused was not a direct perpetrator of the crime." (*People* v. *Nunez, supra,* 183 Cal.App.3d at pp. 225-226.) Taken out of context, this statement is irrational. A jury which finds that a defendant did not personally use a handgun in a case in which the victim died from gunshot wounds is clearly stating its belief that the defendant was not the perpetrator.

This is not what the *Nunez* court either needed or could have meant to say. The statement appears in *Nunez* in the context of a discussion of *People* v. *Lopez, supra,* 131 Cal.App.3d 565, in which, as I have described, the court held that inconsistencies between a verdict on an offense and a finding

---

[5] Nunez theorized that if he participated only as an aider and abettor he must have shared the principal's intent—which a prior jury determined was something less than malice (since Nunez's coconspirator was convicted of manslaughter, not murder). Similarly, since another jury had concluded that Nunez's other coconspirator had not committed the killing for financial gain, Nunez argued that he also could not have committed the crime for that purpose.

on an enhancement did not invalidate the verdict on the offense. Therefore, the idea the *Nunez* court almost certainly intended to convey by the statement in question is that a jury's finding on an alleged enhancement that an accused did not personally use a firearm does not necessarily mean that the accused could not be *convicted* as a perpetrator *pursuant to an inconsistent verdict on the offense in the same case.*

It also bears pointing out that the *Nunez* court accepted the conclusion in *Lopez* that an inconsistent jury finding cannot be ignored simply because it relates to an enhancement rather than an offense. (*Nunez, supra,* 183 Cal.App.3d at p. 226.) Thus, to the dubious extent that *Nunez* and *Lopez,* which did not involve multiple trials of the same person for the same offense, are at all germane to the issues before us here, they reject rather than support the basic idea upon which my colleagues construct their house of cards.

### 2.

The second theory advanced by the majority attempts to distinguish the jury's negative finding on the gun use allegation from a determination that the accused was not the actual killer. The majority argues that the jury's finding on the gun-use allegation ought not preclude appellant's retrial as the actual perpetrator because "[w]e are not concerned with the subject of punishment following conviction. A use enhancement is relevant only to punishment." (Maj. opn., *ante,* p. 1325.) To be sure, an *affirmative* personal use finding would technically affect only the length of sentence, and not the issue of guilt on the substantive offense (though the jury is unaware of the limited effect of its determination). However, we do not have an affirmative gun-use finding, but a *negative* finding, which has implications that go beyond sentencing. As I have been insisting, the plain and unassailable reality is that when in a murder case the jury determines that a gun-use allegation is untrue it is unmistakably declaring that the defendant was not the perpetrator of the homicide. That this factual determination addresses an allegation pled separately from the offense is not only unknown to the jury but wholly beside the legal point. As earlier explained, the negative finding on the gun use relates to an issue of "ultimate fact." Once such an issue has been validly determined in favor of a defendant, as it has in this case, it cannot be litigated between the same parties in any future lawsuit. (*Ashe* v. *Swenson, supra,* 397 U.S. 436, 443 [25 L.Ed.2d 469, 475].)

The principle that the People are precluded from relitigating the same issue against the same defendant based on the same factual circumstances may apply even if the original determination was sought in connection with the issue of penalty, did not formally result in an acquittal on a charged offense, and did not necessarily negate the possibility of prosecution for an

independent offense. When in *Arizona* v. *Rumsey* (1984) 467 U.S. 203 [81 L.Ed.2d 164, 104 S.Ct. 2305] and *Bullington* v. *Missouri* (1981) 451 U.S. 430 [68 L.Ed.2d 270, 101 S.Ct. 1852], the United States Supreme Court accorded double jeopardy protection to special verdicts rendered by fact finders refusing to impose the death penalty, it reasoned that the verdicts were essentially indistinguishable from acquittals on charged offenses because (1) the prosecution had the burden of proving statutorily defined facts beyond a reasonable doubt; (2) the court or jury was required to make specific findings or render a special verdict; (3) the factfinder's decision was based on a determination that the prosecution either had or had not proved its case; and (4) the determination was made following a hearing which involved the submission of evidence and presentation of argument. (*Arizona* v. *Rumsey, supra,* 467 U.S. at pp. 209-211 [81 L.Ed.2d at pp. 170-171]; *Bullington* v. *Missouri, supra,* 451 U.S. at p. 438 [68 L.Ed.2d at pp. 278-279].) All of these requirements were met in the present case with respect to the gun-use allegation. Thus, the fact that the allegation related, inter alia, to sentencing does not in and of itself permit the substance of the allegation to be relitigated.

My colleagues take me to task for allegedly ignoring the reluctance of the Supreme Court in *Rumsey* and *Bullington* to extend the double jeopardy principle to sentencing and the limited rationale which supports the holdings in those cases. (Maj. opn., *ante,* p. 1328.) The judicial reluctance to which my colleagues refer clearly does not relate to the type of situation presented in this case. *Rumsey* and *Bullington* both involved capital murder charges under state laws that separated trial on the issue of guilt from that on the issue of penalty. In both the triers of fact found against the defendant on the question of guilt but, at the sentencing trial, found that the penalty of death should not be imposed. It was the latter findings that barred the state from seeking to reimpose the death penalty at a second trial. The *Bullington* court noted that the principle of double jeopardy ordinarily does not apply to sentencing because "[t]he imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed." (*Bullington* v. *Missouri, supra,* 451 U.S. at p. 438 [68 L.Ed.2d at p. 278].) Double jeopardy was nevertheless applied in *Bullington* and *Rumsey* because in those cases the prosecution had the burden of proving certain facts beyond a reasonable doubt and the sentencing hearing "resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence." (*Ibid.* [68 L.Ed.2d at p. 279], *Arizona* v. *Rumsey, supra,* 467 U.S. at pp. 209-210 [81 L.Ed.2d at pp. 170-171].) The doubts expressed by the Supreme Court about the application of double jeopardy principles to matters that ordinarily relate only to sentencing certainly do not apply to the situation presented in this case,

where the critical fact was established at a proceeding that did not merely resemble but *was* the trial on the issue of guilt or innocence.

The majority's suggestion that, out of mercy or a desire for leniency, the jury might have issued a negative finding on the gun use even if it really believed appellant was the trigger man is not only inconceivable as a matter of fact but highly irregular as a matter of law. The notion that the jury may have acted out of mercy or a desire for leniency is not based upon anything in the record, but was presumably suggested by judicial reliance on such a possibility in cases like *People* v. *Nunez, supra,* 183 Cal.App.3d at p. 226, involving inconsistent verdicts at a single prosecution. (E.g., *Dunn* v. *United States* (1932) 284 U.S. 390, 393 [76 L.Ed. 356, 359, 52 S.Ct. 189, 80 A.L.R. 161], quoting *Steckler* v. *United States* (2d Cir. 1925) 7 F.2d 59, 60; *People* v. *Amick, supra,* 20 Cal.2d 247, 252, quoting *People* v. *Horowitz* (1933) 131 Cal.App.Supp. 791, 793-794 [19 P.2d 874]; see also *Standefer* v. *United States* (1980) 447 U.S. 10, 11 [64 L.Ed.2d 689, 692-693, 100 S.Ct. 1999].) I am aware of no authority for the proposition that a person may be twice prosecuted for the same offense because an ultimate fact decided adversely to the People in the first trial may have resulted from undeserved mercy or a desire for leniency.

Absent specific and strong reason to think otherwise, an appellate court is required to assume that a jury verdict in a case under review resulted from a proper understanding and application of the trial court's instructions (*Zuckerman* v. *Underwriters at Lloyd's* (1954) 42 Cal.2d 460, 478-479 [267 P.2d 777]; *Palmer* v. *Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 536 [238 Cal.Rptr. 363]; *Trapani* v. *Holzer* (1958) 158 Cal.App.2d 1, 6 [321 P.2d 803]), which in a criminal case includes the admonition that the subject of punishment is not to be discussed or considered by the jury and must not in any way affect its verdict. (CALJIC No. 17.42.) We must presume that the jurors were intelligent persons who understood and followed the instructions they received. (*People* v. *Romo* (1975) 47 Cal.App.3d 976, 990 [121 Cal.Rptr. 684]; *People* v. *Powell* (1960) 186 Cal.App.2d 54, 59 [8 Cal.Rptr. 707].) If reviewing courts are permitted to attribute an unapparent but congenial meaning to a jury verdict with which they otherwise do not agree, they will have freed themselves from the constraints of neutral legal principles and made a mockery of the appellate process.

The record presents absolutely no reason to believe that, as the majority wildly speculates, the jury rejected the gun use allegation out of mercy or "through confusion or ennui." (Maj. opn., *ante*, p. 1324.) On the contrary, what evidence we do have of the jury's motives indicates exactly the opposite of that which my colleagues conveniently imagine. As the majority acknowledges, on the third day of deliberations the jury conveyed a note to

the court stating: "please explain the law concerning complicity, for example, in this case *may the defendant be convicted of murder or attempted murder without having personally fired the bullets?*" (Maj. opn., *ante,* p. 1315, italics added.) Shortly after receiving the requested aiding and abetting instructions the jury returned verdicts of guilty for both first degree murder and attempted murder. Significantly, the jury found the gun-use allegations true as to the attempted murder but untrue as to the murder. The nature of the legal question the jury put to the judge shortly before it returned its verdict and the different findings on the two gun-use allegations plainly show the jury was discriminating in its evaluation of the evidence and that it did not believe defendant pulled the trigger of the gun that killed Karen Taylor.

The record shows not only that the jury knew what it was doing and meant what it said but that the district attorney who prosecuted the case actually anticipated this result.

It was defense counsel—clearly fearful of a compromise verdict—who objected to the giving of aiding and abetting instructions at the close of trial. When the jury later requested such instructions the district attorney urged that they be given and stated that his failure to earlier insist that this be done was inadvertent. The prosecutor's rationale for giving the aiding and abetting instructions was as follows: "What I neglected to bring to the Court's attention and to the jury's attention is because the defense in this case was that the defendant did not commit either offense, that if the jury in fact rejected the defense's version of what happened and accepted the prosecution's version, *and the evidence I think was much stronger on the attempted murder as point out to the defendant* [*sic*] *than on the murder charge,* that if the jury did in fact accept the defendant as being the principal on the attempted murder, and having rejected anyone else's presence, then only two people could have been involved in the murder: The defendant or Ms. Lawanna Walker. *And the jury could still convict the defendant of murder, if they believed Lawanna Walker had in fact fired the fatal shots . . . .*" (Italics added.)

The result foreseen by the district attorney is the result that came to pass. He must now live with it, because, as apparently still needs to be said, the constitutions of this state and nation forbid placing a person twice in jeopardy for the same criminal act. (Cal. Const., art. I, § 15; U.S. Const., 5th Amend.)

3.

Finally, the majority claims collateral estoppel cannot be applied in this case since (1) the gun-use finding was not "essential" to the judgment; and

(2) the prosecution was not permitted to fully litigate the question of appellant's actions at the first trial due to Ms. Walker's refusal to testify.

The majority focuses on language from *Newton v. Superior Court* (9th Cir. 1986) 803 F.2d 1051, 1057, cert. den. (1987) 481 U.S. 1070 [95 L.Ed.2d 873, 107 S.Ct. 2464], which indicates that collateral estoppel will only apply to those issues that were actually litigated and " 'essential to the judgment' " and argues that collateral estoppel should not apply in this case because the use finding is "adjunctive" in nature. This is casuistry. The principle that collateral estoppel only applies to issues essential to the judgment ensures that parties are precluded from relitigating only those issues actually decided by the trier of fact. In the absence of special findings, a later court may know that a subsidiary issue was resolved only if it was "essential to the judgment." It is elementary, however, that inquiry whether a particular issue was essential to an earlier judgment is necessary only if that judgment does not explicitly address the issue or the question is otherwise in doubt. Such inquiry is obviously unnecessary where, as in this case, there can be no doubt either that the original finder of fact specifically addressed and decided the issue in question (because it did so in a special verdict) or that the finding was essential (because, as required by law, the court directed that the finding be made and included it in the judgment). Nor can there be any doubt that the issue originally decided—whether appellant pulled the trigger of the gun that killed Karen Taylor—is the precise issue that would be presented again at the second trial. As pointed out in the Restatement, "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of the [rule of collateral estoppel]." (Rest.2d Judgments, *supra,* § 27(d), p. 255.)

It bears mentioning, in this connection, that double jeopardy protection is regularly accorded criminal defendants in instances in which the jury was much less explicit than the jury here. Under the theory of implied acquittal codified in Penal Code section 1023, "a verdict of guilty of a lesser included offense constitutes an implied acquittal of the greater offense of which the jury could have convicted the defendant." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 511 [183 Cal.Rptr. 647, 646 P.2d 809], fn. omitted; *Green v. Superior Court, supra,* 355 U.S. 184.) Further, "[i]n some circumstances, double jeopardy bars a retrial even though no verdict has been rendered. Once jeopardy attached, discharge of the jury without a verdict is tantamount to an acquittal and prevents a retrial, unless the defendant consented to the discharge or legal necessity required it. [Citations.]" (*Stone, supra,* at p. 516.) It seems to me anomalous to grant double jeopardy protection where a jury has not resolved an issue at all, or done so only by implication,

but to deny protection where, as in this case, the jury has explicitly ruled in favor of the defendant regarding an ultimate fact.

Perhaps the most astonishing aspect of the majority opinion is the notion that collateral estoppel should not be applied in this case because the prosecution did not at the first trial have a full and fair opportunity to litigate the issue of defendant's guilt. (Maj. opn., *ante*, pp. 1325-1326.) The majority bases this theory on the analysis employed by the United States Supreme Court in *Standefer* v. *United States, supra,* 447 U.S. 10, an opinion which has almost nothing to do with the issue before us here. In *Standefer* the defendant was indicted, inter alia, for aiding and abetting a named Internal Revenue Service agent in accepting unlawful compensation. Prior to the indictment, the IRS agent was acquitted of certain of the violations the defendant was accused of aiding and abetting. The defendant thereupon moved to dismiss his indictment as to these violations on the ground that since the agent had been acquitted of such violations, the defendant could not be convicted of aiding and abetting them. In other words, unlike the present case, the defendant in *Standefer* was not subject to retrial; there was no prior jury finding that he could not have committed the offense in the manner charged.

In affirming the trial court's denial of the motion to dismiss, the Supreme Court expounded at some length upon the doctrine of nonmutual collateral estoppel in the context of a criminal case. In explaining that the prosecution is often without the kind of " 'full and fair opportunity to litigate' " that is a prerequisite of estoppel, the court specified the aspects of the criminal law that make this so: "the prosecution's discovery rights in criminal cases are limited, . . . ; it is prohibited from being granted a directed verdict or from obtaining a judgment notwithstanding the verdict no matter how clear the evidence of guilt . . . ; it cannot secure a new trial on the ground that an acquittal was plainly contrary to the weight of the evidence . . . ; and it cannot secure appellate review where a defendant has been acquitted." (*Standefer* v. *United States, supra,* 447 U.S. at p. 22 [64 L.Ed.2d at p. 699].) Moreover, the court observed, "[t]he application of nonmutual estoppel in criminal cases is also complicated by the existence of rules of evidence and exclusion unique to our criminal law." (*Id.,* at p. 23 [64 L.Ed.2d at p. 700].) Thus, "[i]t is frequently true in criminal cases that evidence inadmissible against one defendant is admissible against another. The exclusionary rule, for example, may bar the government from introducing evidence against one defendant because that evidence was obtained in violation of his constitutional rights. . . . In such circumstances, where evidentiary rules prevent the Government from presenting all its proof in the first case, application of nonmutual estoppel would be plainly unwarranted." (*Id.,* at pp. 23-24 [64 L.Ed.2d at p. 700], fn. omitted.)

The reason the court refused to estop the initial prosecution of one person because of the acquittal of another on related charges is because of the unfairness that would result if the present defendant were permitted to *vicariously* reap the benefit of rules preventing the prosecution from fully presenting its proof against the person first prosecuted and from appealing the acquittal of that other person. No such unfairness would flow from the application of estoppel in this case. The prosecution's discovery rights against defendant were no different at his first trial than they would be at another. Nor was any rule of evidence applicable to the first trial that would not apply at a second. Nor does the absence of any remedial procedure at defendant's first trial provide any equitable justification for a second prosecution.

The reasons the majority thinks it would be "unfair" to estop a second prosecution in this case are not among those referred to in *Standefer,* nor so far as I am aware have they ever previously been relied upon by any court to justify this result. The majority would permit a second prosecution of defendant as perpetrator simply because they agree with the prosecution that he was the perpetrator and because the district attorney at the first trial assertedly was prevented from making a fair presentation of admissible evidence "because of an artificial curtailment of the People's theory and proof . . . . " (Maj. opn., *ante,* p. 1326.)

The "artificial curtailment" of the People's proof consisted of the exercise of the Fifth Amendment right to remain silent by Lawanna Walker, who is now willing to waive that right, and is expected to testify that defendant was the trigger man. This change of heart appears to be the result of a favorable plea bargain which, *though it could have been,* was apparently not offered Ms. Walker at the first trial. The majority seems therefore to be saying that a district attorney may withhold immunity, a favorable plea bargain or some other advantage sought by a witness who otherwise refuses to testify and hope that the jury will convict without that testimony; if the district attorney is proved wrong and the jury acquits, the prosecutor can then simply grant the witness the desired favor in return for the necessary testimony and retry the defendant for the same offense without violence to the doctrine of collateral estoppel. Such a scenario, which permits a district attorney to profit from his own miscalculation, should be inconceivable. Collateral estoppel must be applied independently of a prosecutor's strategy decisions. The district attorney in this case, who, as earlier pointed out, anticipated that the jury might find defendant guilty as an aider and abettor, could as easily before the first trial as afterwards have made Ms. Walker the

offer that appears to have persuaded her to agree to testify. To use the witness's belated change of heart—or, more likely, the district attorney's belated exercise of his considerable power to induce such a change of heart—as a basis upon which to permit defendant to be retried for the same offense, and to do this in the name of fairness, gives a new and grotesque meaning to the word "unfair," which is certainly not the one the *Standefer* court had in mind.

Defendant's guilt or innocence of the offense for which the district attorney would retry him is irrelevant. As has been pointed out, "[w]hile the double jeopardy doctrine is not designed to protect criminals, it must be applied even though the result is frustration in whole or in part of punishment for crime in a particular case, and the fact that the result of upholding a plea of former jeopardy will be that [an] accused will go without sentence or punishment for an offense to which he had pleaded guilty does not alter his rights or change his position as to his right to plead former jeopardy." (22 C.J.S., Criminal Law, § 238, p. 617, citations omitted.)

The majority attempts to show that this case does not involve a double jeopardy issue by theorizing that defendant is subject to "continuing jeopardy," as that concept is explained in *Justices of Boston Municipal Court* v. *Lydon* (1984) 466 U.S. 294 [80 L.Ed.2d 311, 104 S.Ct. 1805]. My colleagues have again missed the point. The concept of continuing jeopardy, which simply permits the retrial of a defendant whose conviction was reversed on appeal, clearly does not permit the retrial of an offense, such as that involved in this case, where "there has been *some event,* such as an acquittal, which terminates the original jeopardy." (*Richardson* v. *United States* (1984) 468 U.S. 317, 325 [82 L.Ed.2d 242, 251, 104 S.Ct. 3081], italics added; see discussion, *ante,* fn. 1, p. 1335.) Not one of the federal and state cases cited by the majority involved an attempt to relitigate an ultimate fact previously determined in favor of the defendant. The cases are all inapposite.

*United States* v. *Ball* (1896) 163 U.S. 662 [41 L.Ed. 300, 16 S.Ct. 1192], one of the early cases on the subject, illustrates very well why a person in the position of the defendant in the present case is not subject to continuing jeopardy. *Ball* involved murder charges against three defendants who were tried together. The jury acquitted one and convicted the other two. On the initial appeal the two convictions were reversed because the indictment, "by reason of failing to aver either the time or the place of the death of [the victim], was fatally defective, and would not support a sentence for murder . . . ." (*Id.,* at p. 664 [41 L.Ed. at p. 301].) The trial court thereupon

dismissed the defective indictment and returned a new indictment against *all three* defendants. The two defendants who had been convicted then "filed a plea of former jeopardy, by reason of their trial and conviction upon the former indictment, and of the dismissal of that indictment." (*Id.,* at p. 665 [41 L.Ed. at p. 301].) The remaining defendant, Millard Fillmore Ball, filed a similar plea but relied primarily on the fact of his acquittal at the first trial. The state appellate court denied all three pleas on the ground that the original indictment was insufficient to serve as an indictment for murder and that the three defendants were therefore not initially placed in jeopardy. All three defendants were convicted at the second trial. The United States Supreme Court approved the reprosecution and affirmed the convictions as to the two defendants whose initial convictions earlier had been reversed, holding that "a defendant, who procures a judgment against him on an indictment to be set aside, may be tried anew upon the same indictment, or upon another indictment, for the same offence for which he had been convicted. [Citations.]" (*Id.,* at p. 672 [41 L.Ed. at p. 303].) In other words, the jeopardy of the two defendants who were initially convicted never terminated and they were subject to "continuing jeopardy."

It is in connection with the third defendant, however, that *Ball* is, for present purposes, most illuminating. The court reversed the conviction of this defendant, concluding that "a general verdict of acquittal upon the issue of not guilty to an indictment undertaking to charge murder, and not objected to before the verdict as insufficient in that respect, is a bar to a second indictment for the same killing." (*United States* v. *Ball, supra,* at p. 669 [41 L.Ed. at p. 302].) In reaching this result, the court essentially adopted language in the dissenting opinion of Justice Livingston in *People* v. *Barrett* (N.Y. 1803) 1 Johns. 66, which until *Ball* had been the leading American case on application of the double jeopardy clause. Justice Livingston's views are particularly relevant to the case before us. " 'This case,' " he stated, " 'presents the novel and unheard of spectacle, of a public officer, whose business it was to frame a correct bill, openly alleging his own inaccuracy or neglect, as a reason for a second trial, when it is not pretended that the merits were not fairly in issue on the first. That a party shall be deprived of the benefit of an acquittal by a jury, on a suggestion of this kind, coming too from the officer who drew the indictment, seems not to comport with that universal and humane principle of criminal law, "that no man shall be brought into danger more than once for the same offence." It is very like permitting a party to take advantage of his own wrong. If this practice be tolerated, when are trials of the accused to end? . . . [T]he prosecutor, if he be dissatisfied and bent on conviction, has nothing to do but to tell the court that his own indictment was good for nothing; that it has no venue, or is deficient in other particulars, and that, therefore, he has

a right to a second chance of convicting the prisoner, and so on, *toties quoties.*'" (*United States* v. *Ball, supra,* at pp. 667-668 [41 L.Ed. at p. 302], quoting *People* v. *Barrett, supra,* 1 Johns. at p. 74, dis. opn. of Livingston, J.)

The majority would permit the previously litigated question whether defendant directly committed the murder of Karen Taylor to be relitigated due in part to the failure of the prosecution at the first trial to obtain the more convincing testimony that it has apparently now secured. This reasoning is constitutionally proscribed. "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the prohibition against successive trials." (*Burks* v. *United States, supra,* 437 U.S. 1, 11 [57 L.Ed.2d at p. 9], fn. omitted; see also, *Greene* v. *Massey* (1978) 437 U.S. 19 [57 L.Ed.2d 15, 98 S.Ct. 2151]; *Hudson* v. *Louisiana* (1981) 450 U.S. 40 [67 L.Ed.2d 30, 101 S.Ct. 970].)

As indicated at the outset, I agree that the evidence suggests defendant may have been the actual killer and not merely an aider and abettor. However, under our system it is not the appellate courts but the jury that is the ultimate arbiter of the facts; its determination should not be disregarded simply because other minds would have reached a different conclusion or to provide the losing side an opportunity to present a stronger case.

Defendant has been subjected to a murder trial at which the jury's expressly determined he did not personally shoot Karen Taylor. As that issue has been clearly decided adversely to the prosecution it cannot be relitigated without offending the Constitutions of California and the United States. Accordingly, I would affirm the judgment.

On January 26, 1989, the concurring and dissenting opinion was modified to read as printed above. A petition for a rehearing was denied January 26, 1989. Kline, P. J., was of the opinion that the petition should be granted. Respondent's petition for review by the Supreme Court was denied April 20, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.